UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:

| | |
|---|---|
| BANYAN CAY RESORT FUND, LLC, | |
| Plaintiff, | **COMPLAINT** |
| v. | |
| DOMENIC J. GATTO, Jr., | |
| Defendant. | |

Plaintiff, Banyan Cay Resort Fund, LLC ("**Plaintiff**" or "**Mezzanine Lender**"), by and through its undersigned attorneys, by way of Complaint against Domenic J. Gatto, Jr. ("**Defendant**" or "**Guarantor**"), alleges on personal knowledge as to its own actions and on information and belief as to all other allegations, as follows:

## NATURE OF THE ACTION

1.    Plaintiff, Banyan Cay Resort Fund, LLC brings this action for compensatory damages, interests, costs, and attorneys' fees against Defendant under certain personal guarantee agreements that he signed as security for financing provided by the Mezzanine Lender in connection with the construction and development of a resort hotel, high-rise multi-family condominium building and residential lots and villas commonly known as Banyan Cay Resort and Golf located in West Palm Beach, Florida (the "**Banyan Cay Resort**").

## PARTIES

2.    Plaintiff, Banyan Cay Resort Fund, LLC, is a limited liability company organized and existing under the laws of the State of Florida, having an office at c/o American Immigration Group, LLC, 1298 Park Street, Atlantic Beach, NY 11509.

3.      The managing member of Plaintiff is Banyan Cay Resort Find Management, LLC, a Florida limited liability company, whose sole member is David Finkelstein, residing in Atlantic Beach, New York.

4.      Plaintiff also has ten Series A members who reside outside of the State of Florida as follows:

| Names | Location of Residence |
| --- | --- |
| Amed Yehya | Jeddah, Saudi Arabia |
| Angelica Nouhi | Pioltello, Italy |
| Charlotte Mccullagh | London, United Kingdom |
| Kalyankrishna Chengari | Nellore, India |
| Krishna Chengari | Nellore, India |
| Elbahlool Khalid Masoud | Istanbul, Turkey |
| Eleanora Bobyleva | Moscow, Russia |
| Habaj El Houssaine | Toulal Meknès, Morocco |
| Vallamate Sai Harsha | Bentonville, Arkansas |
| Viola Melpigano | Brindisi, Italy |

5.      Defendant, Domenic J. Gatto Jr., is an individual who maintains his residence at 5664 High Flyer Rd. S., Palm Beach Gardens, Florida.

## JURISDICTION AND VENUE

6.      There is complete diversity of citizenship in this action between all members of the Plaintiff and the Defendant who are citizens of different states or citizens of a state and citizens of a foreign state.

7.      The amount in controversy in this matter is in excess of $5,000,000, exclusive of interest and costs.

8.      Accordingly, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) or (a)(2).

9.      The Guarantor agreed to submit to the personal jurisdiction of this Court and that this Court is the proper venue of this action. As set forth in Section 4(q) of each of the Mezzanine

Guaranty Agreements (as defined below), the Guarantor agreed to "submit[] to the personal jurisdiction in which the Property is located over any suit, action or proceeding by any person arising from or relating to this agreement or any other of the loan documents." The Property is located in West Palm Beach, Florida.

10.    Pursuant to 28 U.S.C. §1391(a)(1) and (2), venue is also proper in this Court because Defendant resides in Palm Beach Gardens, Florida and a substantial part of the transactions and occurrences giving rise to the Plaintiff's claims occurred in this judicial district.

## **FACTUAL BACKGROUND**

11.    Banyan Cay Resort & Golf, LLC ("**BC Resort & Golf**"), a Delaware limited liability company holds title to that certain real property located in West Palm Beach, Florida as more fully described on **Exhibit 1** and any improvements thereon (the "**Hotel Property**").

12.    Upon information and belief, the improvements to the Hotel Property primarily consist of an incomplete 150-key resort hotel and an operating 18-hole golf course and clubhouse.

13.    Banyan Cay Dev. LLC ("**BC Dev.**"), a Delaware Limited Liability Company holds title to that certain real property located in West Palm Beach, Florida as more fully described on **Exhibit 2** and any improvements thereon (the "**Estate Property**").   BC Resort & Golf and BC Dev. are hereinafter collectively referred to as the "**Hotel Borrowers**".

14.    Upon information and belief, the Estate Property consists of unimproved estate lots (out of an original 52 estate lots) and a separate unimproved lot approved for construction of a 179-unit high-rise multi-family condominium building.

15.    Banyan Cay Villas, LLC (the "**Villas Borrower**" and together with the Hotel Borrowers, collectively, the "**Subsidiary Borrowers**") holds title to that certain real property located in West Palm Beach, Florida as more fully described on **Exhibit 3** and all improvements

thereon (the "**Villas Property**" and together with the Hotel Property, collectively, the "**Property**").

16.     Upon information and belief, the Villas Property consists of unimproved lots for 22 resort golf villas.

17.     Banyan Cay Mezzanine Borrower, LLC (the "**Parent Company**" or "**Mezzanine Borrower**") is the direct legal and beneficial owner of one hundred percent (100%) of the issued and outstanding limited liability company interests in each of the Subsidiary Borrowers, together with all certificates evidencing ownership of such interests, and all claims, powers, privileges, benefits, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by each of the Subsidiary Borrowers to the Mezzanine Borrower (collectively, the "**Pledged Company Interests**").

18.     Upon information and belief, the membership interests of the Mezzanine Borrower are entirely held by Banyan Cay Investment LLC ("**BC Investment**") and the organizational relationship among BC Investment, the Mezzanine Borrower, the Subsidiary Borrowers, and Mezzanine Lender and Senior Lender (as defined below) are set forth in the chart attached hereto as **Exhibit 4**.

19.     Upon information and belief, the Defendant holds an interest, directly or indirectly, in BC Investment.

**The Senior Loans**

20.     On or about September 30, 2020, the U.S. Real Estate Credit Holdings III-A, LP (the "**Senior Lender**") entered into that certain Amended and Restated Loan Agreement (the "**Original Hotel Loan Agreement**") for a loan in the original principal amount of up to

$61,000,000 (the "**Hotel Loan**") with the Hotel Borrowers. A true and correct copy of the Original Hotel Loan Agreement is attached hereto as **Exhibit 5.**

21.     As set forth in section 2.2 of the Original Hotel Loan Agreement, all sums due and owed under the Original Hotel Loan Agreement were required to be repaid, in full, by September 30, 2022 (the "**Original Maturity Date**").

22.     The Hotel Loan is evidenced by that certain Amended, Restated and Future Advance Promissory Note dated as of September 30, 2020 made by Hotel Borrowers to the Senior Lender in the amount of the Hotel Loan (the "**Original Hotel Note**"), and is secured by, among other things, an Amended and Restated Mortgage, Security Agreement, dated as of September 30, 2020, made by Hotel Borrowers in favor of the Senior Lender (the "**Original Hotel Mortgage**") which encumbers the Hotel Property.

23.     The Hotel Loan is also secured by the Second Priority Mortgage, Security Agreement and Financing Statement (Golf Villas Property for Hotel Loan) dated as of September 30, 2020, made by the Villas Borrower (the "**Hotel Second Lien Mortgage**" and together with the Original Hotel Loan Agreement, Original Hotel Note, Original Hotel Mortgage, and all other documents evidencing, securing, amending or executed in connection with the Hotel Loan, collectively, the "**Hotel Loan Documents**"), which encumbers the Villas Property. A true and correct copy of the Hotel Second Lien Mortgage is attached hereto as **Exhibit 6**.

24.     On or about September 30, 2020, the Senior Lender and the Villas Borrower entered into that certain Loan Agreement (the "**Original Villas Loan Agreement**") for a loan in the original principal amount of up to $19,000,000 (the "**Villas Loan**"). A true and correct copy of the Original Villas Loan Agreement is attached hereto as **Exhibit 7**. The Villas Loan and the Hotel Loan are hereinafter collectively referred to as the "**Senior Loans**").

25.     The Villas Loan is evidenced by a certain Future Advance Promissory Note (Golf Villas Loan) dated as of September 30, 2020, made by the Villas Borrower to the Senior Lender in the amount of up to the Villas Loan (the "**Original Villas Note**"), and is secured by, among other things, that certain Mortgage, Security Agreement dated as of September 30, 2020, made by the Villas Borrower in favor of the Senior Lender (the "**Original Villas Mortgage**"), which encumbers the Villas Property.  True and correct copies of the Original Villas Note and the Original Villas Mortgage are attached hereto as **Exhibit 8** and **Exhibit 9**, respectively.

26.     The Villas Loan is also secured by the Second Priority Mortgage, Security Agreement and Financing Statement (Hotel Property for Golf Villas Loan) dated as of September 30, 2020, made by the Hotel Borrowers (the "**Villas Second Lien Mortgage**" and together with the Original Villas Loan Agreement, Original Villas Note, Original Villas Mortgage, and all other documents evidencing, securing, amending or executed in connection with the Villas Loan, collectively, the "**Villas Loan Documents**")**,** which encumbers the Hotel Property.  A true and correct copy of the Villas Second Lien Mortgage is attached hereto as Exhibit 10.

**The Mezzanine Loan**

27.     On or about October 15, 2020, the Mezzanine Lender and the Mezzanine Borrower entered into that certain Mezzanine Loan Agreement (the "**Mezzanine Loan Agreement**"),[1] providing for a loan to the Mezzanine Borrower in the original principal amount of up to $60,000,000 (the **"Mezzanine Loan"**).  A true and correct copy of the Mezzanine Loan Agreement is attached hereto as **Exhibit 11**.

28.     The Mezzanine Loan is evidenced by a certain Mezzanine Loan Promissory Note dated as of October 15, 2020, made by the Mezzanine Borrower in favor of the Mezzanine Lender

---

[1] Capitalized terms used but not defined in this Complaint shall have the meanings ascribed to them in the Mezzanine Loan Agreement.

in the amount of up to $60,000,000 (the "**Mezzanine Note**" ), and is secured by, among other things, that certain Pledge and Security Agreement dated as of October 15, 2020, made by the Mezzanine Borrower in favor of Mezzanine Lender, pursuant to which the Mezzanine Lender was granted a first priority security interest in the Pledged Company Interests and the other collateral set forth in Sections 2(ii) – (v) of the Pledge Agreement (collectively, the "**Pledged Collateral**"). True and correct copies of the Mezzanine Note and Pledge Agreement are attached hereto as **Exhibit 12** and **Exhibit 13**, respectively.   The Mezzanine Loan Agreement, Mezzanine Note, Pledge Agreement and all other documents evidencing, securing, amending or executed in connection with the Mezzanine Loan Agreement are hereinafter collectively referred to as the "**Mezzanine Loan Documents**".

29.     As contemplated by the Mezzanine Loan Agreement, the Mezzanine Lender obtained investors ("**EB-5 Investors**") through the EB-5 Program a/k/a the Immigrant Investor Program administered by the U.S. Citizenship and Immigration Services ("**USCIS**"), which allows qualified foreign investors who meet specific capital investment and job creation requirements, to obtain their permanent residency in the United States.

30.     At the time the Mezzanine Loan Agreement was entered into, the Mezzanine Lender advanced to the Mezzanine Borrower the principal amount of $5,000,000.00 thereunder, which reflected substantial sums contributed by the EB-5 Investors. *See* Mezzanine Loan Agreement, § 2.3(a).

31.     Pursuant to the Mezzanine Loan Agreement, repayment of the Mezzanine Loan advanced by the Mezzanine Lender to the Mezzanine Borrower was to be made on the "Initial Maturity Date," which is defined as five (5) years from the date of the initial advance.   *See* Mezzanine Loan Agreement, §§1.2, 2.2(f).

32.     However, if an "Event of Default" (as defined in the Mezzanine Loan Agreement) occurs, the Mezzanine Lender may elect to accelerate and declare all sums owing to Mezzanine Lender under the Mezzanine Note, the Mezzanine Loan Agreement and the other Mezzanine Loan Documents immediately due and payable.  *See* Mezzanine Loan Agreement, §§1.2, 11.2.

**Mezzanine Borrower Was Prohibited from Encumbering the Property or Amending the Senior Loan Documents Without the Mezzanine Lender's Prior Consent**

33.     As set forth in Section 9.9(a) of the Mezzanine Loan Agreement, the Mezzanine Borrower acknowledged that the "encumbrance or transfer of an interest in the Property or in Mezzanine Borrower whether direct or indirect, will materially impair [Mezzanine] Lender's security…".

34.     Mezzanine Borrower agreed that it would "not effect a Transfer, either directly or indirectly, or by operation of law, without in each instance first obtaining [Mezzanine] Lender's prior written consent, which consent may be withheld for any reason, or given upon such terms and conditions as [Mezzanine] Lender deems necessary or appropriate, all within [Mezzanine] Lender's sole and absolute discretion…".  *See* Mezzanine Loan Agreement, § 9.9(a).

35.     Under the Mezzanine Loan Agreement, the term "**Transfer**" means and includes the "sale, transfer, hypothecation, encumbrance, mortgage, conveyance…of the Property, or any portion thereof or interest therein…(or entering into an agreement or contract to do any of the foregoing that is not conditioned on compliance with the terms of the Mezzanine Loan Documents)…".  *See* Mezzanine Loan Agreement, § 1.2.

36.     In addition, Section 9.9.3 of the Mezzanine Loan Agreement also required the Mezzanine Borrower to obtain written consent from the Mezzanine Lender before modifying any of the Hotel Loan Documents or Villas Loan Documents (collectively, the "**Senior Loan Documents**").

37.     As such, the Mezzanine Loan Agreement expressly barred the Mezzanine Borrower from directly or indirectly granting or allowing further mortgages and encumbrances against the Property without the Mezzanine Lender's written consent.

38.     The Mezzanine Lender never provided the Mezzanine Borrower with written consent to further mortgage or encumber the Property or otherwise effectuate a Transfer.

**The Senior Loan Documents were Amended in Violation of the Mezzanine Loan Agreement**

39.     The Mezzanine Borrower authorized and allowed the Subsidiary Borrowers to enter into several amendments to the Senior Loan Documents that increased the Senior Loan and purported debt secured by the Senior Lender's mortgages against the Property, thereby further encumbering the Property without the Mezzanine Lender's written consent.

40.     On or about September 2, 2021, the Senior Lender and Subsidiary Borrowers entered into that certain First Amendment to Loan Agreement and Other Loan Documents (the "**First Amended Villas Loan Agreement**") to, among other things, amend the Original Villas Loan Agreement to: (a) provide for an increase in the principal amount of the Villas Loan; and (b) to extend the maturity date of the Villas Loan from the Original Maturity Date (i.e., September 30, 2022) to December 31, 2022.  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the First Amended Villas Loan Agreement is attached hereto as **Exhibit 14**.

41.     As set forth in Section 2(d) of the First Amended Villas Loan Agreement, the Senior Lender amended the Villas Loan Agreement to, among other things, increase the maximum principal amount of the Villas Loan to $24,000,000 – an increase of $5,000,000 from the original $19,000,000 provided for in the Original Villas Loan Agreement.

42.     The increase to the principal amount of the Villas Loan is further evidenced by that certain Amended and Restated Future Advance Promissory Note dated as of September 2, 2021,

made by the Villas Borrower to the Senior Lender in the maximum principal amount of $24,000,000 (the "**First Amended Villas Note**"), and is purportedly secured by, among other things, that certain First Amendment to Mortgage and Other Loan Documents dated as of September 2, 2021, made by the Villas Borrower in favor of the Senior Lender (the "**First Amended Villas Mortgage**").  True and correct copies of what the Senior Lender filed in the Foreclosure Action as the First Amended Villas Note and the First Amended Villas Mortgage are attached hereto as **Exhibit 15** and **Exhibit 16**, respectively.

43.   On or about September 2, 2021, the Senior Lender and Hotel Borrowers also entered into the First Amendment to Second Priority Mortgage and Second Priority Assignment of Leases and Rents (Hotel Property for Villas Loans) dated September 2, 2021 (the "**First Amended Second Priority Mortgage for Villas Loan**").   A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the First Amended Second Priority Mortgage for Villas Loan is attached hereto as **Exhibit 17**.  The First Amended Villas Loan Agreement, the First Amended Villas Note, the First Amended Villas Mortgage, the First Amended Second Priority Mortgage for Villas Loan and all other documents evidencing, securing, amending or executed in connection with such loan documents are hereinafter collectively referred to as the "**First Villas Loan Amendments**"

44.   Upon information and belief, on or about December 31, 2021, the Senior Lender and Villas Borrower entered into that certain Amended and Restated Loan Agreement and Other Loan Documents (the "**Second Amended Villas Loan Agreement**") to, among other things, further amend the Original Villas Loan Agreement to: (a) provide for an increase in the principal amount of the Villas Loan and (b) to shorten the maturity date of the Villas Loan from December 31, 2022, to July 1, 2022.

45.     Despite the Mezzanine Lender's requests, the Senior Lender has not provided copies of the Second Amended Villas Loan Agreement; however, the further increase to the principal amount of the Villas Loan is evidenced by: (i) that certain Second Amended and Restated Future Advance Promissory Note dated as of December 31, 2021, made by the Villas Borrower to the Senior Lender in the maximum principal amount of $13,000,000 (the "**Second Amended Villas Note**"), and (ii) that certain Future Advance Promissory Note A-2 (Golf Villas Loan) dated as of December 31, 2021, made by the Villas Borrower to the Senior Lender in the maximum principal amount of $20,000,000 (the "**Villas Future Advance Note**").   True and correct copies of what the Senior Lender filed in the Foreclosure Action as the Second Amended Villas Note and the Villas Future Advance Note are attached hereto as **Exhibit 18** and **Exhibit 19**, respectively.

46.     The Second Amended Villas Note and the Villas Future Advance Note are purportedly secured by, among other things, that certain Second Amendment to Mortgage and Other Loan Documents dated as of December 31, 2021, made by the Villas Borrower in favor of the Senior Lender (the "**Second Amended Villas Mortgage**"). A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the Second Amended Villas Mortgage is attached hereto as **Exhibit 20**.   The Second Amended Villas Loan Agreement, the Second Amended Villas Note, the Villas Future Advance Note, the Second Amended Villas Mortgage and all other documents evidencing, securing, amending or executed in connection with such loan documents are hereinafter collectively referred to as the "**Second Villas Loan Amendments**".

47.     As set forth in Recital B of the Second Amended Villas Mortgage, the Second Villas Loan Amendments were completed "to, among other things, shorten the Maturity Date of the [Villas] Loan, and evidence a new aggregate maximum principal [Villas] Loan amount of $33,000,000…".

48.     Neither the Mezzanine Borrower nor the Senior Lender ever sought, nor received, consent from the Mezzanine Lender to the First Villas Amendments or the Second Villas Amendments (collectively, the "**Villas Loan Amendments**").

49.     In addition to amending the Villas Loan without the Mezzanine Lender's consent, the Senior Lender and the Hotel Borrowers entered into that certain Second Amendment to Amended and Restated Loan Agreement and Other Loan Documents dated September 2, 2021 (the "**Second Amended Hotel Loan Agreement**") to, among other things, amend the Original Hotel Loan Agreement to extend the maturity date of the Hotel Loan from the Original Maturity Date (i.e., September 30, 2022) to December 31, 2022.  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the Second Amended Hotel Loan Agreement is attached hereto as **Exhibit 21**.

50.     The extension of the maturity date of the Hotel Loan is further evidenced by that certain Second Amended, Restated and Future Advance Promissory Note (Banyan Cay Resort) dated September 2, 2021, made by Hotel Borrowers to the Senior Lender (the "**Second Amended Hotel Note**") and is purportedly secured by, among other things, that certain Second Amendment to Mortgage and Other Loan Documents dated September 2, 2021, between the Hotel Borrowers and Senior Lender (the "**Second Amended Hotel Mortgage**").  True and correct copies of what the Senior Lender filed in the Foreclosure Action as the Second Amended Hotel Note and the Second Amended Hotel Mortgage are attached hereto as **Exhibit 22** and **Exhibit 23**, respectively.

51.     The Senior Lender and Hotel Borrowers also entered into the First Amendment to Second Priority Mortgage and Second Priority Assignment of Leases and Rents (Golf Villas Property for Hotel Loan) dated September 2, 2021, between the Villas Borrower and the Senior Lender (the "**First Amended Second Priority Mortgage for Hotel Loan**".  A true and correct

copy of what the Senior Lender filed in the Foreclosure Action as the First Amended Second Priority Mortgage for Hotel Loan is attached hereto as **Exhibit 24**.   The Second Amended Hotel Loan Agreement, Second Amended Hotel Note, Second Amended Hotel Mortgage, First Amended Second Priority Mortgage for Hotel Loan and all other documents evidencing, securing, amending or executed in connection with such loan documents are hereinafter referred to collectively as the "**Second Hotel Loan Amendments**".

52.    Subsequently, the Senior Lender and the Hotel Borrowers entered into that certain Third Amendment to Amended and Restated Loan Agreement and Other Loan Documents dated December 31, 2021 (the "**Third Amended Hotel Loan Agreement**") to, among other things, further amend the Original Hotel Loan Agreement to shorten the Maturity Date of the Hotel Loan from December 31, 2022 to July 1, 2022.  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the Third Amended Hotel Loan Agreement is attached hereto as **Exhibit 25**.

53.    The shortening of the maturity date of the Hotel Loan is further evidenced by that certain Third Amendment to Mortgage and Other Loan Documents, dated December 31, 2021, between the Hotel Borrowers and Senior Lender (the "**Third Amended Hotel Mortgage**").  A true and correct copy of what the Senior Lender filed in the Foreclosure Action as the Third Amended Hotel Mortgage is attached hereto as **Exhibit 26**.  The Third Amended Hotel Loan Agreement, Third Amended Hotel Mortgage and all other documents evidencing, securing, amending or executed in connection with the Third Amended Hotel Loan Agreement are hereinafter collectively referred to as the "**Third Hotel Loan Amendments**".

54.    Neither the Mezzanine Borrower nor the Senior Lender sought or received consent from the Mezzanine Lender to enter into the Second Hotel Loan Amendments or the Third Hotel

Loan Amendments (collectively, the "**Hotel Loan Amendments**" and together with the Villas

Loan Amendments, collectively, the "**Senior Loan Amendments**").

**The Mezzanine Borrower Failed to Cause the Subsidiary Borrowers to Complete Construction of the Improvements to the Property**

55.     Pursuant to the Mezzanine Loan Agreement, the Mezzanine Borrower was required

to cause the Subsidiary Borrowers to complete improvements to the Property on or before the

Completion Date.

56.     Specifically, Section 9.13 of the Mezzanine Loan Agreement provides that:

> [Mezzanine] Borrower shall cause [Subsidiary] Borrower[s] to
> diligently pursue construction of all Improvements to Completion
> on or prior to the Completion Date in accordance with the Approved
> Budget and the Construction Documents and in compliance with all
> restrictions covenants and easements affecting the Property, all
> Applicable Laws, the Management Agreement and all required
> approvals of Governmental Authorities, and with all terms and
> conditions of the [Mezzanine] Loan Documents, free from any liens
> (other than Permitted Encumbrances), claims or assessments (actual
> or contingent) asserted against the Property for any material, labor
> or other items furnished in connection therewith unless bonded and
> removed as a Lien on the Property. Evidence of satisfactory
> compliance with the foregoing shall be furnished by [Mezzanine]
> Borrower to [Mezzanine] Lender or before the Completion Date.

57.     The "**Completion Date**" is defined in the Mezzanine Loan Documents by reference

to the definition of the same term in the Original Hotel Loan Agreement and the Original Villas

Loan Agreement, which generally defines the term as December 15, 2021.  *See* Mezzanine Loan

Agreement, § 1.2; Original Hotel Loan Agreement, § 1.2; and Original Villas Loan Agreement, §

1.2.

58.     Pursuant to Section 6.24 of the Mezzanine Loan Agreement, the Mezzanine

Borrower was required to complete or cause to be completed the Required Construction Work (as

defined in the Mezzanine Loan Agreement) and to obtain a final certificate of occupancy for the Property on or before the Completion Date.

59.    Furthermore, Section 1.2 of the Mezzanine Loan Agreement states that "Completion" means completion of all Improvements in a turnkey, lien-free manner and the satisfaction of all of the following conditions as reasonably determined by Lender in its sole discretion:

  i. a written certification from [Mezzanine] Borrower shall have been delivered to the [Mezzanine] Lender certifying **that the Improvements have been completed, lien free**, and in the commercially reasonable opinion of the [Mezzanine] Borrower in accordance with the Construction Documents and Approved Budget and in compliance with all Applicable Laws and, if required by [Mezzanine] Lender, the matters in such certification shall have been verified by the Construction Consultant [emphasis supplied];

  ii. [Mezzanine] Lender receives a copy of the permanent certificates of occupancy for the use and operation of the Property in accordance with the [Mezzanine] Loan Documents, the Management Agreement, together with evidence that all other Governmental Authorities have been issued and all Applicable Laws have been satisfied so as to allow the Property to be sued and operated in accordance with the [Mezzanine] Loan Documents and the Management Agreement;

  iii. [Mezzanine] Lender receives (x) evidence of the payment of all costs and expenses of completing the Improvements and (y) **full and complete lien releases from the Architect, the Engineer, the General Contractor and subcontractors performing work in connection with the design, development and construction of the Improvements**… [emphasis supplied]

60.    Upon information and belief, the Subsidiary Borrowers started the construction of some of the Improvements (as defined in the Mezzanine Loan Agreement); however, they failed to timely complete substantial portions of the Improvements on or before the Completion Date or thereafter.

61.    The Subsidiary Borrowers engaged Jacob Industries, LLC, as their general contractor, and numerous other contractors and subcontractors to provide labor, materials and supplies to improve the Property, but have not paid them various amounts.

62.     The following contractors (collectively, the "**Banyan Cay Contractors**") recorded the following mechanic's liens against all or parts of the Property in the Public Records of Palm Beach County, Florida (collectively, the "**Mechanics Liens**") which Mechanics Liens, upon information and belief, remain outstanding:

| Amount of Lien/Unpaid Amount | Name of Lienor |
| --- | --- |
| $52,726.29 | Twins Flooring Group, LLC |
| $273,440.00 | Twins Flooring Group, LLC |
| $28,477.89 | CEMEX Construction Materials Florida, LLC |
| $27,257.71 | CEMEX Construction Materials Florida, LLC |
| $54,434.50 | Structural Roof Systems, Inc. |
| $146,774.70 | WM D Adeirmy Jr, Inc. |
| $72,500.00 | WM D Adeirmy Jr, Inc. |
| $28,015.52 | CEMEX Construction Materials Florida, LLC |
| $28,015.52 | Wm. D. Adeimy, Jr., Inc. |
| $6,104,111.39 | Jacob Industries, LLC |
| $455.00 | Buckeye Plumbing, Inc. |
| $55,574.74 | South Dade Lighting INC. |
| $970,464.84 | Canam Electric, LLC |
| $303,926.71 | Complete Cooling & Heating Services, Inc. |
| $19,765.00 | Electrical Supplies, Inc |
| $272,362.70 | Landmark Interiors of Florida LLC |
| $23,198.50 | Hardrives of Delray, Inc. d/b/a Hardrives, Inc. |
| $196,630.93 | Hardrives of Delray, Inc. d/b/a Hardrives, Inc. |
| $2,411.73 | Hughes Supply a div of Hajoca Corporation |
| $477,194.00 | Habana Excavating Inc. |
| $37,322.45 | World Electric Supply Inc. - WPB |
| $203,967.10 | Atlantic Doors & Hardware, Inc. |
| $12,250.00 | Shenandoah General Construction |
| $104,017.37 | Ferguson Waterworks |
| $118,597.33 | A Christian Glass & Mirror CO. |
| $299,122.03 | Tasco Plumbing and Mechanical Service, LLC |
| $90,590.50 | TK Elevator Corporation (f/k/a Thyssenkrupp Elevator Corporation) |
| $23,700.00 | A Beautiful Ceiling |
| $21,692.31 | The Sherwin-Williams Company |
| $11,397.39 | L&W Supply Corp |
| $560,622.20 | Florida Exotic A Landscape Co INC |
| $8,546.18 | Brags & Hayes, INC. |
| $41,040.14 | Ferguson Eterprises LLC |
| $105,601.75 | Pipeline Utilities, Inc. |
| $28,542.39 | Pipeline Utilities, Inc. |

| | |
|---|---|
| $287,639.87 | Certified Pool Mechanics 1, Inc. |
| $135,197.40 | JWD Trees Inc. |
| $82,882.71 | Metro- Fire Protection Services, Inc. |
| $83,775.43 | Eric'sons, Inc. |
| $66,597.00 | HD Pace Company |
| $33,842.50 | Adache Group Architects, LLC |
| $11,066.40 | Sunbelt Rentals, INC. |
| $76,022.67 | Wolverine Roofing, LLC |
| $62,962.25 | Chuck's Backhoe Service Inc. |
| $20,305.39 | Ekert Concrete Cutting, Inc. |
| $202,288.26 | Magnificent Hardscapes, Inc. |
| $46,422.15 | Mardale Specialities Direct |
| $26,200.00 | Nicot Services Corp |
| $223,470.32 | Palm Beach Custom Woodworks, LLC |
| $80,000.00 | Fagan Engineering, Inc. |

63. Upon information and belief, the aggregate amount of the outstanding Mechanics Liens is $12,243,419.16.

64. Pursuant to Section 2(b) of the Third Amended Hotel Loan Agreement, the Completion Date under the Hotel Loan Documents was extended to April 30, 2022.

65. Upon information and belief, the Villas Loan Documents were also amended to extend the Completion Date to a date on or after April 30, 2022.

66. On May 2, 2022, the Senior Lender sent to the Hotel Borrowers a letter (the "**First Senior Default Notice**") that notified the Hotel Borrowers of certain Events of Default (as defined in the Hotel Loan Agreement) asserted by the Senior Lender relating to the failure of the Hotel Borrowers to timely complete construction of certain improvements to the Property and to obtain a temporary certificate of occupancy.  A true and correct copy of the First Senior Default Notice is attached hereto as **Exhibit 27**.

67. On May 23, 2022, the Senior Lender sent to the Hotel Borrowers a second letter (the "**Second Senior Default Notice**") that again notified the Hotel Borrowers of certain Events of Default (as defined in the Hotel Loan Agreement) asserted by the Senior Lender relating to the

failure of the Hotel Borrowers to timely complete construction of certain improvements to the Property and to obtain a temporary certificate of occupancy.  A true and correct copy of the Second Senior Default Notice is attached hereto as **Exhibit 28**.

68.     Construction of the Improvements required under the Mezzanine Loan Agreement has not been completed as of the filing of this Complaint and neither the Mezzanine Borrower nor the Subsidiary Borrowers have the funds to pay the Banyan Cay Contractors, to discharge the Mechanics Liens and to complete the Improvements.

69.     Upon information and belief, the Mechanics Liens remain outstanding and impair the Mezzanine Lender's ability to realize and recover from the Pledged Collateral or otherwise the amounts owed under the Mezzanine Loan Agreement.

70.     As a result of the foregoing, the Mezzanine Borrower is in breach of Sections 6.24 and 9.13 of the Mezzanine Loan Agreement due to its failure to: (a) complete and/or cause the Required Construction Work to be completed by the Completion Date (or any extension thereof without Mezzanine Lender's consent); (b) obtain a final certificate of occupancy for the Property by the Completion Date (or any extension thereof without Mezzanine Lender's consent); and (c) complete construction of the Improvements lien free by reason of the filing of the Mechanics Liens.

**Senior Lender Foreclosure Action**

71.     On or about July 16, 2022, the Senior Lender filed a Verified Complaint (the "**Foreclosure Complaint**") against the Subsidiary Borrowers and certain other parties (collectively, the "**Foreclosure Defendants**") in the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida (the "**State Court**"), Case No. 50-2022-CA-006815-XXXX-MB (Div. AA) (the "**Foreclosure Action**").  A true and correct copy of the Foreclosure Complaint without exhibits is attached hereto as **Exhibit 29**.

72.     In the Foreclosure Action the Senior Lender: (a) asserts claims for breaches of the Hotel Loan Documents and the Villas Loan Documents, as modified by the Senior Loan Amendments; (b) seeks to foreclose on and enforce the Senior Lender's mortgages and security interests encumbering the Property, personal property, leases and rents;, and (c) seeks to enforce various personal guarantee agreements with respect to the Hotel Loan and the Villas Loan executed by Domenic J. Gatto, Jr. – the Defendant in this action.

**Mezzanine Borrower's Default under Mezzanine Loan Documents and Mezzanine Lender's Actions to Enforce the Pledge Agreement and Sell the Pledged Interests under the UCC**

73.     On August 3, 2022, the Mezzanine Lender sent the Mezzanine Borrower a Default and Acceleration Notice (the "**Mezzanine Lender Default Notice**") informing the Mezzanine Borrower of its Existing Defaults (as defined in the Mezzanine Default Notice) under the Mezzanine Loan Agreement and other Mezzanine Loan Documents which include, without limitation: (a) the Subsidiary Borrowers' failure to pay-off the Senior Loan at maturity; (b) the Mezzanine Borrower's failure to provide the Mezzanine Lender with notice of the defaults under the Senior Loan Documents as asserted by the Senior Lender; and (c) the failure by the Mezzanine Borrower, the Subsidiary Borrowers and Guarantor to complete the Required Construction Work and to obtain a final certificate of occupancy for the Property on or before the Completion Date. A true and correct copy of the Mezzanine Lender Default Notice is attached hereto as **Exhibit 30**.

74.     In addition, the Mezzanine Default Notice also advised the Mezzanine Borrower that the Mezzanine Lender was electing to accelerate the Mezzanine Loan as a result of the Existing Defaults and requested payment of the outstanding amounts owed under the Mezzanine Loan Documents.

75.     The Mezzanine Lender also caused a copy of the Mezzanine Default Notice to be sent to the Guarantor.

76.     Pursuant to Section 2.2(b) of the Mezzanine Loan Agreement, any payments of principal or other amounts not paid when due under the Mezzanine Loan Agreement bear interest at Initial Term Interest Rate of 7% and the Default Interest Rate of 5%.

77.     In addition, Section 12.11 of the Mezzanine Loan Agreement requires the Mezzanine Borrower to pay to the Mezzanine Lender amounts for all attorneys' fees and expenses and all costs incurred by Mezzanine Lender, together with the foregoing interest thereon, in connection with the Mezzanine Lender's enforcement of any of the Mezzanine Loan Documents or as a consequence of any Event of Default thereunder including, without limitation, attorneys' fees and expenses incurred by the Mezzanine Lender in any bankruptcy proceeding.

78.     As a result of the Mezzanine Borrower's defaults under the Mezzanine Loan Documents, on December 16, 2022, the Mezzanine Lender sent a Notification of Disposition of Collateral (the "**First Disposition Notice**") to the Mezzanine Borrower and Guarantor to, among other things, give notice of the Mezzanine Lender's intention to sell the Pledged Collateral at a public foreclosure sale on February 17, 2023 (the "**Public UCC Sale**") or by a private foreclosure sale to a third party on or after January 4, 2023, to satisfy the Outstanding Obligations (as defined in the First Disposition Notice) in accordance with the Uniform Commercial Code as adopted by the State of Florida (the "**UCC**").   A true and correct copy of the First Disposition Notice is attached hereto as **Exhibit 31**.

79.     On December 28, 2022, the Mezzanine Lender sent a Second Notification of Disposition of Collateral (the "**Second Disposition Notice**" and together with the First Disposition Notice, collectively, the "**Disposition Notices**") to the Mezzanine Borrower and Guarantor to, among other things, again, give notice of the Mezzanine Lender's intention to sell the Pledged

Collateral at the Public UCC Sale or by a private sale to a third party on or after February 10, 2023.  A true and correct copy of the Second Disposition Notice is attached hereto as **Exhibit 32**.

80.     The Mezzanine Lender engaged professionals to provide advertising, marketing/advisory and auctioneer services in connection with the foreclosure sale of the Pledged Collateral at the UCC Public Sale scheduled on February 17, 2023 or by private sale.

**Mezzanine Borrower and Subsidiary Borrowers File Chapter 11 Bankruptcy Petitions**

81.     Under Section 9.10(r) of the Mezzanine Loan Agreement, the Mezzanine Borrower covenanted that it will not file "a petition for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law".

82.     On February 16, 2023, on the eve of the UCC Public Sale, the Mezzanine Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Mezzanine Borrower Ch. 11 Petition**") with the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "**Bankruptcy Court**"), Case No. 23-11281-EPK (the "**Mezzanine Borrower Bankruptcy Case**"), which remains pending in the Bankruptcy Court.

83.     The filing of the Ch. 11 Petition automatically stayed the Public UCC Sale pursuant to Section 362(a) of the Bankruptcy Code.

84.     On March 29, 2023, shortly before the Senior Lender's foreclosure sale of the Property, each Subsidiary Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court, Case Nos. 23-12386-EPK, 23-12387- EPK, and 23-12388-EPK (collectively, the "**Banyan Cay Bankruptcy Case**"), which remain pending in the Bankruptcy Court.

85.     There is presently due and owing the Plaintiff under the Mezzanine Loan Agreement and the other Mezzanine Loan Documents the following indebtedness (collectively, the "**Outstanding Mezzanine Loan Obligations**"):

(a) the $5,000,000.00 principal balance of the Mezzanine Loan, together with (i) accrued and unpaid interest thereon at the Initial Term Interest Rate of 7% for the period 10/15/22 – 3/31/23 in the amount of $162,361.11, (ii) accrued and unpaid interest thereon at the Default Interest Rate of 5% for the period 8/3/22 – 3/31/23 in the amount of $167,361.12, and (iii) continuing accrued and unpaid interest thereon at the Initial Term Interest Rate of 7% and the Default Interest Rate of 5% after March 31, 2023 through the maturity date of the Mezzanine Loan;

(b) UCC foreclosure sale advertising, marketing/advisory and auctioneer fees and expenses of $256,859.22 (Newmark & Company Real Estate, Inc. ($200,000.00); JP&R Advertising Agency, Inc. ($46,859.22); and Mannion Auctions, LLC ($10,000.00)); and

(c) Attorneys' fees, court costs/filing fees and expenses (including, without limitation, UCC, lien, title and other search costs) incurred and continuing to be incurred by the Mezzanine Lender related to or in connection with its enforcement of the Mezzanine Loan Documents, Events of Default thereunder and various legal and bankruptcy proceedings (including, without limitation, the Mezzanine Borrower Bankruptcy Case and the Banyan Cay Bankruptcy Case).

**The Mezzanine Guaranty Agreements**

86.     As additional security for the Mezzanine Borrower's obligations under the Mezzanine Loan Agreement and other Mezzanine Loan Documents, the Mezzanine Lender required the Guarantor to execute certain guarantee agreements in favor the Mezzanine Lender.

87.     Guarantor executed and delivered to the Mezzanine Lender that certain Mezzanine Indemnity and Guaranty Agreement dated October 15, 2020 (the "**Payment Guaranty**").  A true and correct copy of the Payment Guaranty is attached hereto as **Exhibit 33**.

88.     Guarantor executed and delivered to the Mezzanine Lender that certain Mezzanine Completion Guaranty Agreement dated October 15, 2020 (the "**Completion Guaranty**").  A true and correct copy of the Completion Guaranty is attached hereto as **Exhibit 34**.  The Payment

Guaranty and the Completion Guaranty are hereinafter collectively referred to as the "**Mezzanine Guaranty Agreements**".

89.     Pursuant to Section 1(a) of the Payment Guaranty, the Guarantor assumed liability for and agreed to indemnify and guaranty payment to the Mezzanine Lender for all Costs (as defined in the Payment Guaranty) (hereinafter "**Costs**") imposed upon, incurred by or awarded against the Mezzanine Lender as a result of the Guaranteed Recourse Obligations (as defined in the Payment Guaranty) which include, among others, the following:

> a.      "any and all Losses to the extent caused by failure to pay any…mechanic's liens, materialmen's liens or other liens which would create liens on any portion of the Property which would be superior to the lien or security title of the Security Instrument [meaning the Pledge Agreement] or the other Loan Documents to the full extent of the amount claimed by any such lien claimant…" (the "**Mechanics Lien Recourse Obligations**") [*see* Payment Guaranty, § 1(a)(ix)];

> b.      "any and all Losses to the extent caused by any violation of Section 9.10 of the [Mezzanine] Loan Agreement" (the "**SPE Recourse Obligations**") [*see* Payment Guaranty, § 1(a)(x)];

> c.      "for all obligations set forth in the [Mezzanine] Loan Documents, including without limitation the payment of all principal, interest, and other amounts under the [Mezzanine] Note, in the event of any transfer of or further encumbrance placed on the Property in violation of Section 9.9 of the [Mezzanine] Loan Agreement" (the "**Transfer/Further Encumbrance Recourse Obligations**") [*see* Payment Guaranty, § 1(a)(xi)];

> d.      "for all obligations set forth in the [Mezzanine] Loan Documents, including without limitation the payment of all principal, interest, and other amounts under [the Mezzanine] Note, if [Mezzanine] Borrower shall voluntarily file a petition under Title 11 of the U.S. Code (the "Act"), as such Act may from time to time be amended, or under any similar or successor Federal statute relating to bankruptcy…or if the Property shall become subject to the jurisdiction of a Federal bankruptcy court or similar state court…" (the "**Bankruptcy Recourse Obligations**") [*see* Payment Guaranty, § 1(a)(xii)]; and

e.      "any and all Losses in the event [Mezzanine] Borrower fails to complete, or fails to cause to be completed, the Required Construction Work in accordance with the terms of the [Mezzanine] Loan Agreement…"  (the "**Completion Recourse Obligations**") [*see* Payment Guaranty, § 1(a)(xiv)].

90.     Section 4(n) of the Payment Guaranty provides that the losing party shall pay the prevailing party's attorneys' fees and costs in any dispute or action relating to the Payment Guaranty and, to the extent the Mezzanine Lender is the prevailing party, such costs, fees and expenses shall be included in Costs ("**Payment Guaranty Enforcement Fees and Costs**").

91.     Pursuant to Section 1(a) of the Completion Guaranty, the Guarantor assumed liability for and agreed to indemnify and guaranty payment to the Mezzanine Lender for all Costs imposed upon, incurred by or awarded against the Mezzanine Lender as a result of the Guaranteed Recourse Obligations (as defined in the Completion Guaranty) which include, among others, paying for or causing to be paid the Required Improvements (as defined in the Completion Guaranty) and removing or causing to be removed or discharged any mechanic's or materialmen's liens filed against the Property (collectively, the "**Completion and Mechanics Lien Recourse Obligations**").  *See* Completion Guaranty, § 1(a)(i) – (ii).

92.     Section 4(n) of the Completion Guaranty provides that the losing party shall pay the prevailing party's attorneys' fees and costs in any dispute or action relating to the Completion Guaranty and, to the extent the Mezzanine Lender is the prevailing party, such costs, fees and expenses shall be included in Costs (collectively, the "**Completion Guaranty Enforcement Fees and Costs**").

## COUNT I

**(Breach of Payment Guaranty – Claim for Bankruptcy Recourse Obligations)**

93.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

94.     As a result of the Mezzanine Borrower's filing of the Ch. 11 Petition with the Bankruptcy Court and the Property becoming subject to the jurisdiction of the Bankruptcy Court in the Banyan Cay Bankruptcy Case, the Guarantor assumed and became liable to the Mezzanine Lender for all Costs associated with the Bankruptcy Recourse Obligations consisting of the Outstanding Mezzanine Loan Obligations in excess of $6,000,000.00.

95.     The Guarantor has failed and/or refused to pay the Outstanding Mezzanine Obligations in breach of the Payment Guaranty.

96.     Guarantor is also liable to Plaintiff for the Payment Guaranty Enforcement Fees and Costs incurred and to be incurred by Plaintiff in connection with action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Guarantor for compensatory damages for the Outstanding Mezzanine Loan Obligations in an amount in excess of $6,000,000.00, plus continuing pre-judgment interest thereon on and after April 1, 2023, the Payment Guaranty Enforcement Fees and Costs and such further and other relief as the Court determines is just and appropriate.

## COUNT II

### (Breach of Payment Guaranty – Claim for Transfer/Further Encumbrance Recourse Obligations)

97.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

98.     Section 9.9(a) of the Mezzanine Loan Agreement prohibited the Mezzanine Borrower from effectuating a Transfer, either directly or indirectly, without the Mezzanine Lender's prior written consent.

99.     A Transfer includes, *inter alia*, an encumbrance or mortgage of the Property, or any portion thereof or interest therein, voluntarily, involuntarily or by operation of law.  *See* Mezzanine Loan Agreement, § 1.2, page 12.

100.    Without the Mezzanine Lender's prior written consent, the Mezzanine Borrower effected further encumbrances and mortgages of the Property as a result of: (a) the recording of the Mechanics Liens by the Banyan Cay Contractors; and (b) the recording of certain amendments to the Senior Lender's mortgages against the Property which increased the principal amount of the Villas Loan purportedly secured thereby from an original amount up to $19,000,000 to an amount up to $33,000,000, pursuant to certain of the Senior Loan Amendments that the Mezzanine Borrower authorized the Subsidiary Borrowers to enter into with the Senior Lender.

101.    Upon information and belief, the Senior Lender made advances on the Villas Loan, in the aggregate amount of at least $26,749,000.63.

102.    As a result of such principal advances of the Villas Loan, the indebtedness purportedly secured by the Senior Lender's mortgages against the Property increased by an aggregate amount in excess of $8,749,000 (the "**Additional Senior Mortgage Debt**" which the Mezzanine Lender disputes), consisting of a principal increase of $7,749,000 and various fees, charges and unpaid interest thereon in excess of $1,000,000.00.

103.    As a result of the recording of the Mechanics Liens and the amendments to the Senior Lender's mortgages purporting to secure the Additional Senior Mortgage Debt, the Guarantor assumed and became liable to the Mezzanine Lender for all Costs associated with the Transfer/Further Encumbrance Recourse Obligations consisting of the Outstanding Mezzanine Loan Obligations in excess of $6,000,000.00, together the Payment Guaranty Enforcement Fees and Costs incurred and to be incurred by Plaintiff in connection with action.

26

104.    The Guarantor has failed and/or refused to pay the Additional Senior Mortgage Debt or the Outstanding Mezzanine Loan Obligations in breach of the Payment Guaranty.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Guarantor for compensatory damages for the Outstanding Mezzanine Loan Obligations in an amount in excess of $6,000,000.00, plus continuing pre-judgment interest thereon on and after April 1, 2023, the Payment Guaranty Enforcement Fees and Costs and such further and other relief as the Court determines is just and appropriate.

## COUNT III

**(Breach of Payment Guaranty – Claim for Completion Recourse Obligations)**

105.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

106.    The Mezzanine Borrower  failed to complete or cause to be completed the Required Construction Work in accordance with the terms of the Mezzanine Loan Agreement (including, without limitation section 9.13 thereof) because the Improvements were neither completed on or prior to the Completion Date nor completed free of any liens against the Property (other than Permitted Encumbrances) due to the filing of the Mechanics Liens and the amendments to the Senior Lender's mortgages purporting to secure the Additional Senior Mortgage Debt.

107.    Upon information and belief, the Mezzanine Lender estimates that the costs to complete such Required Construction Work (including the payment and/or discharge of the Mechanics Liens) and to obtain related governmental approvals and permits are in excess of $15,000,000.00 (collectively, the "**Completion Costs**").

108.    The Subsidiary Borrowers have not completed and opened the Banyan Cay Hotel and Resort and improved and sold the remaining lots at the Property to generate revenues for the

Subsidiary Borrowers and the Mezzanine Lender, thereby preventing any possible repayment of the Outstanding Mezzanine Obligations.

109.    The Mezzanine Lender's security interest in the Pledged Collateral has been substantially impaired and prejudiced.

110.    As a result of the foregoing, the Guarantor assumed and became liable to the Mezzanine Lender for all Costs associated with the Completion Recourse Obligations consisting of the Completion Costs; however, as the Completion Costs exceed the Outstanding Mezzanine Obligations, the Mezzanine Lender agrees to cap the Costs associated with the Completion Recourse Obligations to the Outstanding Mezzanine Obligations in excess of $6,000,000.00, together with the Payment Guaranty Enforcement Fees and Costs incurred and to be incurred by Plaintiff in connection with action.

111.    The Guarantor has failed and/or refused to pay the Completion Costs or the Outstanding Mezzanine Obligations in breach of the Payment Guaranty.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Guarantor for compensatory damages for the Outstanding Mezzanine Obligations in an amount in excess of $6,000,000.00, plus continuing pre-judgment interest thereon on and after April 1, 2023, the Payment Guaranty Enforcement Fees and Costs and such further and other relief as the Court determines is just and appropriate.

## COUNT IV

**(Breach of Payment Guaranty – Claim for Mechanics Lien Recourse Obligations)**

112.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

113.     As a result of the recording of the Mechanics Liens, the Guarantor assumed and became liable to the Mezzanine Lender for all Costs associated with the Mechanics Lien Recourse Obligations consisting of the outstanding Mechanics Liens in excess of $12,000,000.00; however, as the amount of such Mechanics Liens exceeds the Outstanding Mezzanine Obligations, the Mezzanine Lender agrees to cap the Costs associated with the Mechanics Lien Recourse Obligations to the Outstanding Mezzanine Obligations in excess of $6,000,000.00, together with the Payment Guaranty Enforcement Fees and Costs incurred and to be incurred by Plaintiff in connection with action.

114.     The Guarantor has failed and/or refused to pay the Mechanics Liens or Outstanding Mezzanine Loan Obligations in breach of the Payment Guaranty.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Guarantor for compensatory damages for the Outstanding Mezzanine Obligations in an amount in excess of $6,000,000.00, plus continuing pre-judgment interest thereon on and after April 1, 2023, the Payment Guaranty Enforcement Fees and Costs and such further and other relief as the Court determines is just and appropriate.

## **COUNT V**

### **(Breach of Payment Guaranty – Claim for SPE Recourse Obligations)**

115.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

116.     Guarantor is liable to Plaintiff for Costs associated with any Losses caused by any violation of Section 9.10 of the [Mezzanine] Loan Agreement which contains numerous single purpose entity covenants in favor the Mezzanine Borrower.

117.     Under Section 9.10(e) of the Mezzanine Loan Agreement, the Mezzanine Borrower agreed that it shall not permit the Subsidiary Borrowers from incurring or creating "any indebtedness or liabilities, secured or unsecured, direct or contingent, other than (i) the Mortgage Loan and incidental costs and expenses associated therewith, (ii) the CDD Loan, and (iii) the Permitted Indebtedness as defined in the Mortgage Loan agreement in effect as of the date hereof."

118.     The Mezzanine Borrower permitted the Subsidiary Borrowers to incur or create additional indebtedness or liabilities in violation of Section 9.10(e) of the Mezzanine Loan Agreement due to the recording of the Mechanics Liens and the amendments to the Senior Lender's mortgages purporting to secure the Additional Senior Mortgage Debt.

119.     As a result of the foregoing, the Guarantor assumed and became liable to the Mezzanine Lender for all Costs associated with the SPE Recourse Obligations consisting of the outstanding Mechanics Liens in excess of $12,000,000.00 and the Additional Senior Mortgage Debt; however, as the amount of such Mechanics Liens and the Additional Senior Mortgage Debt exceeds the Outstanding Mezzanine Obligations, the Mezzanine Lender agrees to cap the Costs associated with the SPE Recourse Obligations to the Outstanding Mezzanine Obligations in excess of $6,000,000.00, together with the Payment Guaranty Enforcement Fees and Costs incurred and to be incurred by Plaintiff in connection with action.

120.     The Guarantor has failed and/or refused to pay the Mechanics Liens, the Additional Senior Mortgage Debt and/or the Outstanding Mezzanine Loan Obligations in breach of the Payment Guaranty.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Guarantor for compensatory damages for the Outstanding Mezzanine Obligations in an amount in excess of $6,000,000.00, plus continuing pre-judgment interest

thereon on and after April 1, 2023, the Payment Guaranty Enforcement Fees and Costs and such further and other relief as the Court determines is just and appropriate.

## COUNT VI

**(Breach of Completion Guaranty – Claim for Completion and Mechanics Lien Recourse Obligations)**

121.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

122.     The Mezzanine Borrower failed to complete or cause to be completed the Required Construction Work in accordance with the terms of the Mezzanine Loan Agreement (including, without limitation section 9.13 thereof) because the Improvements were neither completed on or prior to the Completion Date nor completed free of any mechanic's or materialmen's liens against the Property due to the filing of the Mechanics Liens against the Property.

123.     The Mezzanine Borrower has failed to pay, discharge or remove the Mechanics Liens and failed to cause the Subsidiary Borrowers to pay, discharge or remove the Mechanics Liens.

124.      Upon information and belief, the Mezzanine Lender estimates that the Completion Costs are in excess of $15,000,000.00.

125.     The Subsidiary Borrowers have not completed and opened the Banyan Cay Hotel and Resort and improved and sold the remaining lots at the Property to generate revenues for the Subsidiary Borrowers and the Mezzanine Lender, thereby preventing any possible repayment of the Outstanding Mezzanine Obligations.

126.     The Mezzanine Lender's security interest in the Pledged Collateral has been substantially impaired and prejudiced.

127.    As a result of the foregoing, the Guarantor assumed and became liable to the Mezzanine Lender for all Costs associated with the Completion Costs in excess of $15,000,000.00; however, as the Completion Costs exceed the Outstanding Mezzanine Loan Obligations, the Mezzanine Lender agrees to cap the Costs associated with the Completion and Mechanics Lien Recourse Obligations to the Outstanding Mezzanine Obligations in excess of $6,000,000.00, together with the Completion Guaranty Enforcement Fees and Costs incurred and to be incurred by Plaintiff in connection with action.

128.    The Guarantor has failed and/or refused to cause the removal or discharge of the Mechanics Liens, and the payment of the Completion Costs and/or the Outstanding Mezzanine Loan Obligations in breach of the Completion Guaranty.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Guarantor for compensatory damages for the Outstanding Mezzanine Loan Obligations in an amount in excess of $6,000,000.00, plus continuing pre-judgment interest thereon on and after April 1, 2023, the Completion Guaranty Enforcement Fees and Costs and such further and other relief as the Court determines is just and appropriate.

Dated:  April 26, 2023.

**DGIM Law, PLLC**
*Counsel for Banyan Cay Resort Fund, LLC*
2875 NE 191st Street, Suite 705
Aventura, FL 33180
Phone: (305) 763-8708

*/s/ Isaac Marcushamer*
Isaac Marcushamer, Esq.
Florida Bar No. 0060373
isaac@dgimlaw.com
Daniel Y. Gielchinsky, Esq.
Florida Bar No. 0097646
dan@dgimlaw.com
Jonathan Groth, Esq.

32

Florida Bar No. 102648
jonathan@dgimlaw.com

-and-
*/s/ Steven E. Ostrow*
Steven E. Ostrow, Esq. (*pro hac vice pending*)
**WHITE AND WILLIAMS LLP**
*Counsel for Banyan Cay Resort Fund, LLC*
7 Times Square, Suite 2900
New York, NY 10036
Steven E. Ostrow, Esq.
ostrows@whiteandwilliams.com
James Vandermark, Esq.
NY Bar No. 5452750
vandermarkj@whiteandwilliams.com