## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No: 9:23-cv-80707-DMM

| | |
|---|---|
| BANYAN CAY RESORT FUND, LLC,<br><br>               Plaintiff,<br><br>v.<br><br>DOMENIC J. GATTO, Jr.,<br><br>               Defendant. | **ANSWER AND AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT AND COUNTERCLAIMS AND THIRD-PARTY CLAIMS** |

Domenic J. Gatto, Jr. ("**Defendant**" or "**Guarantor**") submits this answer to the Amended Complaint (the "**Complaint**") filed by plaintiff, Banyan Cay Resort Fund, LLC ("**Plaintiff**" or "**Mezzanine Lender**"), and asserts counterclaims against Plaintiff and third-party claims against the Mezzanine Lender's principal, David Finkelstein ("**Finkelstein**"), and an entity owned and/or controlled by Finkelstein, American Immigration Group, LLC ("**AIG**"), together with Finkelstein, the ("**Third-Party Claim Defendant**" and the Third-Party Claim Defendants, together with Plaintiff, the "**Finkelstein Parties**").

## ANSWER

## NATURE OF THE ACTION

1.     Admitted that Plaintiff brings this action but denied that it is entitled to the relief it seeks.

## PARTIES

2.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

3.      Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

4.      Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

5.      The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

6.      Admitted.

**JURISDICTION AND VENUE**

7.      The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

8.      Admitted that Plaintiff purports to seek recovery of an amount in excess of $5,000,000, but denied that Plaintiff is entitled to any relief.

9.      The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

10.      Admitted.

11.      Admitted.

**FACTUAL BACKGROUND**

12.      Admitted.

13.      Admitted.

14.      Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the underlying documents for their true and complete contents and deny any allegations inconsistent therewith.

**<u>The Senior Loans</u>**

19.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of this paragraph, and refer to the referenced document for its true and complete contents, and deny any allegations inconsistent therewith.

20.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

21.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.   To the extent a response is required, refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

22.     Admitted that a true and correct copy of the referenced document is attached but refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

23.     Admitted that a true and correct copy of the referenced document is attached but refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

24.     Admitted that a true and correct copy of the referenced document is attached but refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

25.     Admitted that a true and correct copy of the referenced document is attached but refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

**The Mezzanine Loan**

26.     The allegations in this paragraph purport to state a legal conclusion to which no response is required. Admitted that a true and correct copy of the referenced document is attached but refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

27.      Admitted that a true and correct copy of the referenced documents is attached but refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

28.     Denied, except admitted that a few EB-5 investors were obtained.

29.     Denied, except without knowledge or information sufficient to form a belief as to the source of the funds, admit that Banyan Cay Mezzanine Borrower, LLC has received $5,000,000 from Banyan Cay Resort Fund LLC, deny that it reflected "substantial funds" and refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

30.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.   To the extent a response is required, refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

31.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

**Mezzanine Borrower Was Prohibited from Encumbering the Property or Amending the Senior Loan Documents Without the Mezzanine Lender's Prior Consent**

32.     Admitted that a true and correct copy of the referenced document is attached, but refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

33.     Admitted that a true and correct copy of the referenced document is attached as referenced, but refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

34.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

35.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

36.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

37.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**The Senior Loan Documents were Amended in Violation of the Mezzanine Loan Agreement**

38.     Denied.

39.     Admitted that a true and correct copy of the referenced document is attached as referenced, but refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

40.     Admitted that a true and correct copy of the referenced document is attached as referenced, but refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

41.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

42.     Admitted that a true and correct copy of the referenced document is attached as referenced, but refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

43.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and otherwise refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

44.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. Further, the allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

45.      The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations and refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

46.      The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in the second to last sentence of this paragraph, refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

47.      The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

48.      Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

49.      Admitted that a true and correct copy of the referenced document is attached as referenced, but otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations and refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

50.      Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning actions taken by the Senior Lender, and refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

51.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning actions taken by the Senior Lender, and refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

52.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning actions taken by the Senior Lender, and refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

53.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations concerning actions of the Senior Lender.

54.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

**The Mezzanine Borrower Failed to Cause the Subsidiary Borrowers to Complete Construction of the Improvements to the Property**

55.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

56.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

57.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced documents for their true and complete contents and deny any allegations inconsistent therewith.

58.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

59.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith. Admit that construction of improvements were undertaken, but could not be completed as a result of actions taken by Plaintiff and its managing member.

60.     Admitted that Jacob Industries, LLC was retained as a general contractor, otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

61.     Denied, except admit that Jacob Industries, LLC and other entities provided labor, materials, and supplies in connection with the Project.

62.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and refer to the referenced Public Records for their true and complete contents and deny any allegations inconsistent therewith.

63.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

64.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

65.     Admitted that a true and correct copy of the referenced document is attached as referenced, but otherwise refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

66.     Admitted that a true and correct copy of the referenced document is attached as referenced, but otherwise refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

67.     Admitted that the construction of improvements has not been completed as a result of actions taken or failed to be taken by Plaintiff and its managers and for that reason Banyan Cay Contractors have not been paid in full.

68.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

69.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

70.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

71.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

72.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

**Senior Lender Foreclosure Action**

73.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of this paragraph, admit that on or about July 16, 2022, U.S. Real Estate Credit Holdings III-A, LP filed a Verified Complaint against Banyan Cay Resort & Golf, LLC, Banyan Cay Dev. LLC, Banyan Cay Villas, LLC and certain other parties in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, Case No. 50-22-CA-006815-XXXX-MB, and refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

74.     Admit that a foreclosure action was filed as alleged, and refer to the pleadings in the referenced action for their true and complete contents and deny any allegations inconsistent therewith.

**Mezzanine Borrower's Default under Mezzanine Loan Documents and Mezzanine Lender's Actions to Enforce the Pledge Agreement and Sell the Pledged Interests under the UCC**

75.     Admitted that a true and correct copy of the referenced document is attached as referenced, but deny any liability and refer to the referenced document for its true and complete contents.

76.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

77.     Admitted.

78.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

79.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

80.     Denied.

81.     Admitted that a true and correct copy of the referenced document is attached as referenced Otherwise, the allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

82.     Without knowledge or information sufficient to form a belief as to the truth of the allegations

83.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

84.     Denied, except admit that, on February 16, 2023, Banyan Cay Mezzanine Borrower, LLC filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, Case No. 23-11281-EPK and the case remains pending.

85.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

86.     Admitted.

87.     Denied.

**The Mezzanine Guaranty Agreements**

88.     Admitted that defendant executed guarantee agreements, otherwise denied.

89.     Admitted.

90.     Admitted.

91.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

92.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

93.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

94.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

## COUNT I

### (Breach of Payment Guaranty – Claim for Bankruptcy Recourse Obligations)

95.     Defendant restates his responses to the foregoing paragraphs as if fully set forth herein.

96.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

97.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

98.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied, and further denied that Plaintiff is entitled to any of the requested relief set forth in the WHEREFORE clause.

## COUNT II

### (Breach of Payment Guaranty – Claim for
### Transfer/Further Encumbrance Recourse Obligations)

99.     Defendant restates his responses to the foregoing paragraphs as if fully set forth herein.  Defendant further states that the wholesale incorporation of prior allegations in this count is improper.

100.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

101.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

14

102.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

103.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

104.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

105.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

106.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied, and further denied that Plaintiff is entitled to any of the requested relief set forth in the WHEREFORE clause.

## COUNT III

**(Breach of Payment Guaranty — Claim for Completion Recourse Obligations)**

107.     Defendant restates his responses to the foregoing paragraphs as if fully set forth herein. Defendant further states that the wholesale incorporation of prior allegations in this count is improper.

108.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

109.     Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

110.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

111.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

112.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

113.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied, and further denied that Plaintiff is entitled to any of the requested relief set forth in the WHEREFORE clause.

## <u>COUNT IV</u>

### (Breach of Payment Guaranty — Claim for Mechanics Lien Recourse Obligations)

114.     Defendant restates his responses to the foregoing paragraphs as if fully set forth herein. Defendant further states that the wholesale incorporation of prior allegations in this count is improper.

115.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

116.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied, and further denied that Plaintiff is entitled to any of the requested relief set forth in the WHEREFORE clause.

## COUNT V

**(Breach of Payment Guaranty — Claim for SPE Recourse Obligations)**

117.     Defendant restates his responses to the foregoing paragraphs as if fully set forth herein. Defendant further states that the wholesale incorporation of prior allegations in this count is improper.

118.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

119.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, refer to the referenced document for its true and complete contents and deny any allegations inconsistent therewith.

120.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

121.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

122.     The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied, and further denied that Plaintiff is entitled to any of the requested relief set forth in the WHEREFORE clause.

## COUNT VI

**(Breach of Completion Guaranty – Claim for
Completion and Mechanics Lien Recourse Obligations)**

123.     Defendant restates his responses to the foregoing paragraphs as if fully set forth herein. Defendant further states that the wholesale incorporation of prior allegations in this count is improper.

17

124.    The allegations in this paragraph purport to state a legal conclusion to which no response is required.   To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

125.    The allegations in this paragraph purport to state a legal conclusion to which no response is required.   To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

126.    Without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

127.    The allegations in this paragraph purport to state a legal conclusion to which no response is required.   To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

128.    The allegations in this paragraph purport to state a legal conclusion to which no response is required.   To the extent a response is required, without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

129.    The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied.

130.    The allegations in this paragraph purport to state a legal conclusion to which no response is required.  To the extent a response is required, denied, and further denied that Plaintiff is entitled to any of the requested relief set forth in the WHEREFORE clause.

## **AFFIRMATIVE DEFENSES**

Defendant asserts the following defenses and affirmative defenses in response to Plaintiff's Complaint, undertaking the burden only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated below:

## FIRST AFFIRMATIVE DEFENSE-EQUITABLE ESTOPPEL

Plaintiff's claims are barred, in whole or in part, by the doctrine of equitable estoppel. At all material times, Plaintiff was controlled by and acting at the direction of David Finkelstein, sole member of Banyan Cay Resort Fund Management, L.L.C., the managing member of Plaintiff. Finkelstein, grossly exaggerating his resume, and misrepresented his reputation, competency and acumen as a source, and arranger, of EB-5 funding, (i) contractually entrenched American Immigration as the exclusive provider of EB-5 Financing to the Banyan Entities and (ii) inextricably embedded American Immigration as a central component of the Project's long-term financing and business plan.

Finkelstein misrepresented his relationship and experience with Allied Capital, which was in 2013, and remains today a leading provider and structurer of EB-5 financing (an "**EB-5 Structurer**"). American Immigration's website is replete with misrepresentations concerning Finkelstein's success in raising EB-5 funds.

Defendant was unaware of the circumstances of Finkelstein's separation from Allied Capital and the misrepresentations on the American Immigration's website and his reputation in the EB-5 industry which is greatly dependent on the reputation of the person behind the company when seeking EB-5 investors.

Finkelstein caused Defendant to enter into the guaranties that are the subject of this action by intentionally misrepresenting his experience and that of American Investments and Defendant relied on those misrepresentations to his detriment.

## SECOND AFFIRMATIVE DEFENSE-ECONOMIC DURESS

Plaintiff's claims are barred, in whole or in part, because the purported agreements were the product of economic duress. Defendant entered into the guaranties at issue as a last-ditch effort

to save the Banyan Cay Project. Defendant caused the Mezzanine Borrower to enter into the agreements that Defendant guarantied directly as a result of the potential failure of the Project due to Plaintiff's inability to raise the promised EB-5 funding due to Finkelstein's undisclosed damaged reputation. Finklestein's refusal to make reasonable commercial efforts to obtain the EB-5 financing created the circumstances that led to failure of the project as a result of a lack of EB-5 investor funding what was the consideration for the Mezzanine Borrower entering into the agreements with American Investments which precluded Mezzanine Borrower from using other EB-5 resources which, in turn

### THIRD AFFIRMATIVE DEFENSE-LACK OF CONSIDERATION

Plaintiff's claims are barred, in whole or in part, for lack of consideration. Plaintiff failed to disclose that it was unable to perform the promised consideration of raising the EB-5 financing that Plaintiff, through Finkelstein, represented it would obtain. At the outset Finkelstein knew or should have known that he no longer had the necessary reputation and relationships to raise the funding.  and yet caused fees to be paid to American Investments that it now seeks from Defendant.

### FOURTH AFFIRMATIVE DEFENSE-FAILURE TO MITIGATE

Plaintiff failed to mitigate its damages for the reasons set forth below in paragraphs 4-10 and incorporated herein.

### COUNTERCLAIMS AND THIRD-PARTY CLAIMS

### NATURE OF ACTION AND PRELIMINARY STATEMENT

1.      Defendant brings its counterclaims against Plaintiff and third-party claims against the Third-Party Claim Defendants, in each instance, for compensatory and punitive damages, interests, costs, and attorneys' fees related to, among other things, fraud and inducement perpetrated, and lack of good faith exhibited, by the Finkelstein Parties in connection with the

supposed procurement of financing by the Finkelstein Parties through the EB-5 Program[1] for the benefit of Banyan Cay Resort & Golf, LLC, Banyan Cay Dev. LLC, Banyan Cay Villas, LLC ("**Banyan Villas**"), and Banyan Cay Mezzanine Borrower, LLC (the "**Mezzanine Borrower**" and together with the foregoing entities, and with Banyan Cay Investment, LLC and Banyan Cay Maintenance, LLC, the "**Banyan Entities**").

2.      The Finkelstein Parties engaged in a multi-year pattern of fraud and deceit with respect to Defendant and the Banyan Entities, including by repeatedly promising to deliver tens of millions of dollars from EB-5 Investors to finance the Project (defined below), but ultimately (years later), only delivering a tiny fraction of the funding that Finkelstein promised and that was so desperately needed to complete the Project.  Grossly exaggerating his resume, and misrepresenting his reputation, competency and acumen as a source, and arranger, of EB-5 funding, Finkelstein (i) contractually entrenched American Immigration as the exclusive provider of EB-5 Financing to the Banyan Entities and (ii) inextricably embedded American Immigration as a central component of the Project's long-term financing and business plan.

3. Although Finkelstein woefully failed to deliver on any of his repeated promises of raising substantial EB-5 financing, the Finkelstein Parties nevertheless extracted substantial fees and expenses from the Banyan Entities.

4. In 2022, faced with the economic realities of the Project, the Banyan Entities acted to maximize value to all parties in interest via an out-of-court sale of substantially all of its their

---

[1] The "EB-5 Program" is a U.S. government program designed specifically to serve non-U.S. citizens seeking to immigrate to the United States by making a qualifying investment (such individuals, "**EB-5 Investors**") through a "regional center," as such term is defined at 8 CFR 204.6(e), approved under the Immigrant Investor Pilot Program, as provided at 8 CFR 204.6(m).

assets and, in the process, potentially absolving or greatly reducing Defendant's potential liability under his personal guaranty.

5.      By mid-January 2023, a purchaser was procured who executed a purchase and sale agreement for the Project, the ultimate proceeds of which would have, among other things, paid the Senior Lender (defined below) in full, satisfied unsecured creditors of the Banyan Entities (who are structurally senior to the Mezzanine Lender) and provided a substantial initial payment to the Mezzanine Lender at closing (the "**Proposed Out of Court Transaction**").

6.      The Mezzanine Lender, through counsel, repeatedly encouraged counsel for the Banyan Entities to proceed with the Proposed Out of Court Transaction.

7.      As the date for closing of the Proposed Out of Court Transaction neared, counsel to the Mezzanine Lender was provided with a draft waterfall reflecting the proposed distribution of proceeds at closing, including millions of dollars to the Mezzanine Lender as an initial payment, pending reconciliation of other costs and fees that were required by law to be paid ahead of the Mezzanine Lender.

8.      Notwithstanding the Mezzanine Lender's earlier (and repeated) encouragement to proceed with the Proposed Out of Court Transaction, counsel to the Mezzanine Lender immediately advised that it would oppose any such transaction and, instead, move forward with a UCC foreclosure sale of the membership interests in the Banyan Entities on February 17, 2023 unless Mezzanine Lender was "paid in full" at closing, which included over $1 million in interest payments and other fees and expenses that, upon information and belief, would primarily be retained by the Finkelstein Parties, not the underlying EB-5 Investors.

9.      The decision to push forward with a UCC foreclosure sale was intended to obtain more money for the personal benefit of the Finkelstein Parties, rather maximize the recoveries of

the EB-5 Investors.  Finkelstein's actions substantially destabilized the proposed transaction, lead to much confusion and concern with the proposed purchaser and ultimately forced Mezzanine Borrower to file for protection under title 11 of chapter 11 of the United States Code (the "**Bankruptcy Code**") on February 16, 2023 to protect estate value.

10.     Additionally, on March 29, 2023, in an attempt to efficiently and methodically conduct a court-sanctioned sale of estate assets to benefit all creditors, the other Banyan Entities filed for bankruptcy (collectively with the bankruptcy case of Mezzanine Borrower, the "**Bankruptcy Cases**").[2]

11.     Faced with (i) a stay of the February 17, 2023 UCC foreclosure sale due to the commencement of the Bankruptcy Cases, and (ii) upon information and belief, mounting pressure from his investors, Finkelstein sought someone else to blame for his self-interested decision making.  First, Finkelstein authorized the filing of a complaint against the senior lender to the Banyan Entities, U.S. Real Estate Credit Holdings III-A, LP (the "**Senior Lender**"), in the United States District Court for the District of New York the Southern District of New York District Court captioned *Banyan Cay Resort Fund, LLC v. U.S. Real Estate Credit Holding III-A, LP*, Case No. 23-01345-JPO (the "**Standstill Agreement Action**") claiming breach of the Standstill Agreements (as defined below) between Senior Lender and Mezzanine Lender (*i.e.*, the vehicle Finkelstein controlled and through which the EB-5 Investors invested in the Project).

12.     Next, on the same day Mezzanine Lender agreed to a stay of the Standstill Agreement Action with the Senior Lender, Finkelstein directed the commencement of this action

---

[2] The Bankruptcy Cases are jointly administered under case No. 23-12368, in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division.

to collect against a personal guaranty provided by Defendant that was entered into as a direct consequence of Finkelstein's deceit and fraud.

13.     Mezzanine Lender's current predicament is the product of Finkelstein's own self-dealing and making and yet another example of Finkelstein's value destructive behavior.  It is merely Finkelstein's latest attempt to shift the blame for his fraudulent conduct that severely damaged Defendant and the Banyan Entities, as well as his own strategic misfires and misconduct as a fiduciary to the EB-5 Investors.

14.     In reliance on Finkelstein, the promised funding (of which only a negligible fraction ever materialized) was incorporated into the Banyan Entities' business plan, projections and various milestones.  Finkelstein's gross failure to deliver, which can only be placed on Finkelstein and Finkelstein alone, set the company, and its founder, the Defendant, down a pathway that was destined to fail, causing damages to Defendant.

## PARTIES

15.     Third-Party Claim Defendant Finkelstein is domiciled in Atlantic Beach, New York, and is a citizen of the state of New York. Upon information and belief, Finkelstein is the managing Member of DLF 500, LLC, which is the managing member of AIG.

16.     Finkelstein controls Mezzanine Lender as either its direct Manager or the sole member of the managing member of Mezzanine Lender.[3]  At all relevant times, Finkelstein held himself out to have full power and authority to act on behalf of Mezzanine Lender.

---

[3] The Complaint alleges that Finkelstein is the sole member of the managing member of Mezzanine Lender, Compl. ¶ 3, while Finkelstein has previously signed the Mezzanine Loan Agreement as the direct "Manager" of the Mezzanine Lender.

17.     Third-Party Claim Defendant AIG is a Florida limited liability company, with corporate offices at (i) 600 Third Avenue, Suite 259, New York, NY 10016, and (ii) 1615 Forum Place, Suite 3-A, West Palm Beach, Florida, 33401.

## JURISDICTION AND VENUE

18.     There is complete diversity of citizenship in this action between Defendant and Third-Party Claim Defendants, who are citizens of different states.  Defendant is a resident of Florida, while Finkelstein is a resident of New York and, for purposes of diversity jurisdiction, American Immigration's residence is deemed to be New York since, upon information and belief Finkelstein, a New York resident is the sole member of the member of American Immigration.

19.     The amount in controversy is greater than $7,000,000.00, exclusive of interest and costs.

20.     Accordingly, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) or (a)(2).

21.     The Court has personal jurisdiction over Third-Party Defendant American Immigration because Florida is the state of formation of American Immigration and because in section 2 of a Fee Agreement dated February 21, 2021 American Immigration "consent[ed] to personal jurisdiction in the State of Florida."  The Court has personal jurisdiction over Third-Party Claim Defendant because he is the Chief Executive Officer and Managing Partner of American Immigration, and the acts and omissions that are the subject of this action occurred partially in Florida and he is and has at all material times been Defendant's primary source of contact from AIG  with respect to the Project.

22.     Pursuant to 28. U.S.C. §1391(a)(1) and (2), venue is proper in this Court because Defendant resides in Palm Beach Gardens, Florida and a substantial part of the transactions and occurrences giving rise to the Defendant's claims occurred in this judicial district.

## FACTUAL BACKGROUND

### I.     Genesis of Relationship between Defendant and Finkelstein Parties

23.     In or around 2013, Defendant met Finkelstein while Finkelstein was employed by Allied Capital Management and Development ("**Allied Capital**"), as Allied Capital's Chief Financial Officer.

24.     Upon information and belief, Allied Capital was founded by Nicolas A. Mastroianni II ("**Mastroianni**") in 2004.  Upon information and belief, due to Mastroianni's experience and expertise, Allied Capital was, in 2013, and remains, a leading provider and structurer of EB-5 financing (an "**EB-5 Structurer**").  Specifically, "EB-5 financing" refers to the utilization of the federal EB-5 immigrant investor program, administered by the U.S. Citizenship and Immigration Services, which permits wealthy foreign investors to achieve expedited permanent residence status, to raise funding from said qualified foreign investors.

25.     Upon information and belief, EB-5 financing is structured so that it primarily benefits the EB-5 Structurer that has delivered EB-5 Investors to finance the applicable project.

26.     In 2013, Finkelstein advised Defendant that he separated from Allied Capital and planned to form his own company, American Immigration, to serve as an EB-5 Structurer and procure EB-5 financing for commercial real estate projects and other investment opportunities.

### II.     Initial Retention of American Immigration by Banyan Entities

27.     In the Summer of 2015, subsequent to Finkelstein's separation from Allied Capital, Defendant began discussions with Finkelstein and American Immigration for Finkelstein to procure EB-5 funding for the development of an approximately 200-acre resort and golf complex,

and planned community, in West Palm Beach, Florida called Banyan Cay Resort & Golf Club (the "**Project**").

28.     These discussions were premised upon Finkelstein's repeated misrepresentations to Defendant beginning as early as 2013 regarding his and American Immigration's acumen, reputation, expertise, and success rate, with respect to procuring EB-5 funding.

29.     On September 17, 2015, Defendant, as manager, caused the Mezzanine Borrower to enter into a term sheet with American Immigration (the "**First American Immigration Term Sheet**") for an EB-5 mezzanine loan of up to $35 million.

30.     The First American Immigration Term Sheet required Mezzanine Borrower to pay both (a) an up-front engagement fee to American Immigration of  $65,000 earned immediately regardless of whether American Immigration procured any EB-5 Investors and (b) all of American Immigration's and Finkelstein's fees and expenses incurred during the marketing process to obtain EB-5 investors, which, as of September 17, 2015, already totaled an additional $71,230 and were paid upon signing.

31.     Critically, the retention of American Immigration was binding, including (a) Mezzanine Borrower's agreement that American Immigration was the *exclusive* provider of EB-5 financing for the Project, (b) American Immigration's agreement to provide weekly reports "detailing progress in fundraising efforts and listing subscription agreements executed by Foreign Investors and the status of immigration applications submitted by such Foreign Investors," and (c) an obligation for American Immigration to indemnify Mezzanine Borrower, Defendant and certain other affiliates for all losses caused by or arising out of "any material misrepresentation or omission made by American Immigration," bad faith, gross negligence or willful misconduct by

American Immigration or any breach of the First American Immigration Term Sheet by American Immigration.  First American Immigration Term Sheet § C.

32.     At all relevant times, Finkelstein was made aware and completely understood from the Defendant that the contemplated EB-5 financing was to be the cornerstone of the Project's financing, and would provide the funding necessary to see the Project to fruition.

33.     Further, at all relevant times Finkelstein was made aware and completely understood from the Defendant that the quantum of proposed EB-5 financing, and the applicable negotiated rates and amounts, was factored into the long-term business and development plan for the Project.

34.     Upon information and belief, the contemplated scope of the Project expanded, at Finkelstein's urging based upon his inflated projections shared with Defendant for ultimate EB-5 funding that he would raise.

**Omissions by American Immigration in Connection with Retention by Banyan Entities**

35.     Defendant's decision to cause certain of the Banyan Entities to engage American Immigration was a direct result of Finkelstein's misrepresentations to Defendant regarding, among other things, (i) his credible reputation within the broader EB-5 community, (ii) his past role as an "owner" of Allied Capital, (iii) his connections and accomplishments while working for Allied Capital, including his procurement of millions of dollars in EB- financing for similar projects; and the representations on American Immigration's website concerning its substantial success and its involvement in  highly respected and substantial projects.

36.     At all times, Finkelstein failed to disclose to Defendant, and upon information and belief actively concealed, that his "separation" from Allied Capital was actually the subject of a lawsuit entitled *Allied Capital and Development of South Florida, Harbourside Place, LLC v.*

*David Finkelstein*, Case No. 2014CA006733, filed June 2014, in the Circuit Court of the Fifteenth Judicial Circuit in Palm Beach County, Florida, in which Allied Capital disputed Finkelstein's ownership claims (the "**Undisclosed Finkelstein/Allied Capital Litigation**").

37.     Among other things, contrary to the representations by Finklestein that he was an owner and substantial reason for the success of Allied Capital, the complaint in the Undisclosed Finkelstein/Allied Capital Litigation alleges that Finkelstein was a mere salaried employee paid $3,000 per week (plus health insurance reimbursement) by Allied Capital and had no ownership interest therein because he failed to make the required capital contribution.

38.     The Undisclosed Finkelstein/Allied Capital Litigation settled in or around February 2015, however, upon information and belief, the Undisclosed Finkelstein/Allied Capital Litigation had irreparably damaged Finkelstein's credibility and standing within the EB-5 community, his relationships with other EB-5 related professionals who direct EB-5 Investors to particular projects and his ability to actually raise EB-5 funding. At all material times, Finkelstein omitted these material facts from Defendant - all of which Finkelstein knew or should have known negatively impacted his ability to raise EB-5 funding.

39.     Nonetheless, even after commencement of the Undisclosed Finkelstein/Allied Capital Litigation, and settlement thereof, Finkelstein continued to misrepresent himself and American Immigration to Defendant as a leading provider of EB-5 funding, creating an air of accomplishment and achievement in that lending community even though he was aware that such representations were false. Indeed, American Immigration's website (https://eb5aig.com/eb-5-past-projects/) refers to Finklestein as "one of the leading architects of the EB-5 industry since 2008, involved in real estate projects consisting of over $700 Million of EB-5 funding."

40.     Further, at all relevant times, American Immigration's website (i) misleadingly listed projects that closed before American Immigration was even formed – touting the accomplishments of Allied Capital as deals done by Finkelstein and (ii) lists projects as examples of successful EB-5 financing even though, upon information and belief, certain of them have been mired in economic issues, including the Project.

41.     Neither Defendant nor any of the Banyan Entities were made aware of the Undisclosed Finkelstein/Allied Capital Litigation before execution of the First American Immigration Term Sheet, Second American Immigration Term Sheet, and Third American Immigration Term Sheet (as those terms are defined below). Furthermore, at all material times, neither Defendant nor any of the Banyan Entities were made aware of the omitted information that undermined Finkelstein's ability to secure the substantial funding necessary for the Project.

**III.     Second American Immigration Term Sheet, Provision of Guaranty and Subsequent Marketing Efforts**

42.     Subsequent to entry into the First American Immigration Term Sheet, EB-5 funding failed to materialize.

43.     At Finkelstein's behest the First American Immigration Term Sheet was replaced in November 2016 by a new term sheet (the "**Second American Immigration Term Sheet**") between American Immigration and Banyan Cay Resort and Golf, LLC and Banyan Cay Dev. LLC (together, the "**Hotel Borrowers**") to further entice and spur investment from EB-5 Investors.

44.     The Second American Immigration Term Sheet, among other things, (i) contemplated a $60 million funding, (ii) an interest rate of 6%, (iii) made the EB-5 funding junior to a to-be-procured senior financing, and (iv) added an additional non-refundable $65,000 fee for American Immigration that was earned and payable immediately upon execution (which occurred November 18, 2016).

45.     The Second American Immigration Term Sheet also provided a "Funding Schedule" for the $60 million in EB-5 financing that the Finkelstein Parties were to raise, with the expectation being that the offering materials were to be completed before November 30, 2016 (but not later than December 15, 2016) and, absent "unforeseen changes in the EB-5 Regional Center Program," funds were expected to be released starting the second quarter of 2017 and completed by the second quarter of 2018.

46.     Like the First American Immigration Term Sheet, the Second American Immigration Term Sheet provided that the retention of American Immigration by the Project Companies was binding, including the Hotel Borrowers' agreement to pay American Immigration a second fee immediately upon execution, as well as reimbursement of all expenses related to obtaining EB-5 financing and an agreement that American Immigration was the exclusive provider of EB-5 financing for the Project.  *See* Second American Immigration Term Sheet § C ("This Section C of the Term Sheet is [a] binding and enforceable contract between the Parties hereto").

47.     This binding portion of the Second American Immigration Term Sheet also required American Immigration to "provide weekly reports to [Hotel Borrowers] . . . detailing progress in fundraising efforts and listing subscription agreements executed by Foreign Investors and the status of immigration applications submitted by such Foreign Investors."  *Id.* § C.3.

48.     American Immigration further agreed to indemnify the Hotel Borrowers (defined as "Developer") as well as each "Developer Indemnified Party" (including Defendant as shown below) for, among other things, all damages for any material misrepresentations or omissions or any bad faith of American Immigration as follows:

> [American Immigration] and Lender shall, jointly and severally, indemnify and hold harmless Developer ***and its affiliates and each of its and their officers, directors, employees, partners, members, co-investors***, and legal counsel (each such indemnified person or entity, including Developer, being a "Developer Indemnified

Party") against ***any and all actual losses, claims, damages and liabilities, joint or several, and expenses*** (including all legal or other expenses reasonably incurred by such Developer Indemnified Party) ***caused by or arising out of (i) any material misrepresentation or omission made by [American Immigration] and/or Lender or any of their respective agents, or (ii) the bad faith, gross negligence or willful misconduct of [American Immigration] and/or Lender or any of their respective agents***, or (iii) any breach by [American Immigration] or Lender or any of their respective agents of any U.S. or foreign law in performing the services or other undertakings set forth in this Term Sheet, including all exhibits hereto irrespective of Section B being reduced to the Definitive Agreements.

Second American Immigration Term Sheet § C.5 (emphasis added).

49.     In April 2017, following the execution of the Second American Immigration Term Sheet, Finkelstein and Defendant embarked on an extravagant road show to China that cost the Hotel Borrowers approximately $250,000 and was designed to spur interest in the Project and procure the promised EB-5 funding.

50.     Finkelstein claimed that "[i]t's time to do a road show to slam the door on the funding" because investors are "Just sitting on the fence to meet and see you / Team [because] [t]he Chinese like when you visit. Shows you are invested in them."

51.     Despite the lavish trip, the promised funding, again, failed to materialize.

52.     Further, the Finkelstein Parties failed to abide by their reporting obligations in the Second American Immigration Term to provide weekly progress on the fundraising efforts and executed subscription agreements.

53.     In a May 13, 2017 email exchange, Defendant sought, at a minimum, bi-weekly reporting, but was rebuked by Finkelstein.  The breaches of reporting requirements continued throughout the terms of the Project despite efforts by Mezzanine Borrower and Defendant to obtain the progress reports.

IV.     **Further Inability to Raise EB-5 Funding and Senior Loan**

54.     At this time, to accommodate the growing financial needs of the Project, and allow the continuation of construction, the Banyan Entities required additional financing (beyond an existing loan by a third party), which Finkelstein could not provide *via* EB-5 financing.

55.     Ultimately, the Senior Lender emerged as the best alternative source for obtaining necessary liquidity by the Banyan Entities on a senior secured basis.

56.     The Banyan Entities and Senior Lender entered into a loan agreement for the Senior Loan dated June 14, 2018 (the "**Original Senior Loan Agreement**") in the principal amount of up to $61 million, secured by first priority liens on substantially all of the Hotel Borrowers' property and a three-year term.

57.     Defendant also provided a recourse guaranty and a completion guaranty of certain of the Hotel Borrowers' obligations under the Original Senior Loan Agreement (the "**Senior Loan Guarantees**").

58.     Upon information and belief, the Senior Lender's decision to enter into the Original Senior Loan Agreement, with the three year tenor, was influenced by representations made by Finkelstein, American Immigration and the Mezzanine Lender regarding their ability to raise EB-55 funding and subsequent paydown of the Senior Lender's obligations under the Original Senior Loan Agreement, including a letter on American Immigration letterhead and signed by Finkelstein on behalf of the Mezzanine Lender and sent to Senior Lender, Hotel Borrowers and Defendant dated April 30, 2018 (the "**EB-5 Commitment Letter**"), which stated that that (a) four EB-5 investors had fully funded $500,000 each, (b) an additional four investors are "expected to execute subscription agreements and fund their investments" within 60 days, (c) Finkelstein is in active discussions with 12 additional investors regarding the Project and anticipates "$27 million will be

raised before the end of 2018 and an additional $33 million during 2019," but that the "foregoing projections are based upon our estimates and could change" and (d) "[i]t is our expectation that an initial advance of approximately $5 million will be released to the Project before the end of June 2018."  A copy of the EB-5 Commitment Letter is attached as **Exhibit 1.**

59.     Defendant entered into the Senior Loan Guarantees, in particular the completion guarantee, in reliance on Finkelstein and American Immigration's numerous material misstatements, promises and commitments made to the Defendant beginning around the execution of the First American Immigration Term Sheet and continuing through execution of the Original Senior Loan Agreement in June 2018 to provide EB-5 financing to allow the Hotel Borrowers to complete the Project in the timeframe required by the Original Senior Loan Agreement, including those made in the EB-5 Commitment Letter.

60.     In providing its commitment to lend to the Banyan Entities, the Senior Lender and Banyan Entities integrated the future-EB-5 funding into the construct of the Senior Lender's financing; further tying the Project's success to Finkelstein's ability to procure financing.

61.     Among other things, the Original Senior Loan Agreement expressly permitted, and contemplated, EB-5 financing.  Notably, upon information and belief, EB-5 funding was contemplated to fund 75% of the Hotel Borrowers' approximately $40 million equity requirement. To allow this to occur, the Senior Lender and Mezzanine Lender (an entity controlled by Finkelstein acting on behalf of the EB-5 Investors) negotiated and executed on September 28, 2018 a Standstill and Intercreditor Agreement (the "**Original Standstill Agreement**"), which would govern the terms pursuant to which Mezzanine Lender's future EB-5 financing to fund the Project would be subordinated to the Senior Loan.

62.     In connection with the foregoing, American Immigration and the Hotel Borrowers executed a new term sheet for EB-5 financing to be provided to the Project in the form of a Mezzanine Loan on the same date as the Standstill Agreement, September 28, 2018 (the "**Third American Immigration Term Sheet**").

63.     The Third American Immigration Term Sheet included an additional non-refundable $65,000 fee paid upfront to American Immigration.

64.     The Third American Immigration Term Sheet had substantively identical terms for the retention of American Immigration as the exclusive EB-5 financing provider for the Project and American Immigration reaffirmed both (a) its obligation to indemnify all "Developer Indemnified Parties" (including Defendant) agreeing to identical indemnification obligations for, among other things, any losses caused by American Immigration's material misstatements and (b) its obligation to provide weekly pipeline reports showing the status of EB-5 financing.

## V.     The A&R Senior Loan Agreement and 2020 Recapitalization

65.     Despite American Immigration's reaffirmation of its contractual obligations, upon information and belief, American Immigration and Finkelstein continued to refuse to comply with their reporting obligations and failed to provide the Banyan Entities with any EB-5 funding.

66.     On December 20, 2018, Finkelstein acknowledged he did not obtain funding as promised, and further stated "there are literally 4-5 in the process of funding and many more in the process of making up their minds. We have 7 funded in escrow and feel good about the acceptance of Banyan in the market. We will have the 10 very soon and expect monthly funding during 2019." Due to Finkelstein's failure to raise EB-5 financing, between 2018 and 2020, Defendant was also forced to invest millions of his own funds into the Project to satisfy various milestones and infusion

requirements that were, upon information and belief, intended to be satisfied by funds raised by Finkelstein.

67.     Ultimately, the financial strain of supporting the various equity infusions required by the Original Senior Loan Agreement (of which a significant amount was intended to be satisfied via EB-5 funding) was too much, causing a default under the Senior Loan in April 2019 and necessitating a wholesale restructuring and significant amendments to the various documents.

68.     Among other things, the Banyan Entities were forced to deviate from their established business plan, selling valuable estate lots worth approximately $10 million to generate liquidity, and also taking its contractor on as a partner in Banyan Cay Investment, LLC in exchange for decreasing said contractor's claims against certain Banyan Entities and to expedite construction on the Project.

69.     Additionally, the Banyan Entities and Defendant ultimately agreed to (a) an amended and restated Senior Loan Agreement on September 30, 2020 (the "**A&R Senior Loan Agreement**") between Hotel Borrowers and Defendant, and (b) a loan agreement between Senior Lender and Banyan Villas (the "**Villas Senior Loan Agreement**" and, together with the A&R Senior Loan Agreement, the "**Senior Loan Agreements**") which provided an additional [$19 million to fund the Project] but tied continued funding to, among other things, milestones that Finkelstein directly negotiated with Senior Lender that were tied to Finkelstein's and American Immigration's future ability to obtain EB-5 financing as the sole authorized EB-5 financing provider for the Project.

70.     Specifically, if Finkelstein and American Immigration could not provide $7.2 million of EB-5 Financing by the "Excess EB-5 Phase II Deadline" (which required no less than $1.8 million by January 31, 2021, an additional $2.7 million by March 31, 2021 and an additional

$2.7 million by May 31, 2021) then there would be an Event of Default under the A&R Senior Loan Agreement.  *See* A&R Senior Loan Agreement § 4.3.

71.     Shortly after closing of the Senior Loan Agreements and over five years after execution of the First American Immigration Term Sheet, ***Finkelstein and American Immigration delivered only $5 million in EB-5 Financing***. Yet, on April 30, 2018, Finkelstein in correspondence to Defendant, estimated to have $27 million in capital raised by year end, and an additional $33 million in 2019. The $5 million in EB-5 financing paled in comparison to the financing of other Palm Beach County projects that Finkelstein and American Immigration falsely touted on the website as their own accomplishments – *e.g.* Harborside Place ($100 Million in EB-5 funding) and Via Mizner ($160 Million in EB-5 funding).

72.     On October 15, 2020, the Mezzanine Borrower and Mezzanine Lender entered into the Mezzanine Loan Agreement (the "**Mezzanine Loan Agreement**") providing a mezzanine loan of up to $60 million, although only $5 million was available at closing.

73.     At all relevant times, Defendant relied on misrepresentations by American Immigration, Finkelstein and the Mezzanine Lender that significant additional EB-5 financing would be provided under the Mezzanine Loan Agreement to allow the Project to be completed and agreed to provide a recourse guaranty and completion guaranty (the "**Mezzanine Loan Guarantees**").

74.     In connection with closing the Mezzanine Loan Agreement, American Immigration was paid a 1% origination fee and Finkelstein required that Mezzanine Borrower prepay a full year of interest (totaling $350,000) that, upon information and belief, inures primarily to the benefit of Finkelstein rather than the EB-5 Investors.

75.     In connection with the Mezzanine Loan Agreement, on October 15, 2020 the Senior Lender and Mezzanine Lender entered into a hotel intercreditor agreement and villas intercreditor agreement (collectively, the "**Standstill Agreements**") to govern the relative priority of the obligations owed to Senior Lender and Mezzanine Lender and replace the Original Standstill Agreement.

76.     Following entry into the Mezzanine Loan Agreement, procurement of $5 million of EB-5 financing and payment of $350,000 in interest to Mezzanine Lender and payment of American Immigration's origination fee, Finkelstein and American Immigration ceased attempting to deliver additional EB-5 financing and provide the required reporting on the status thereof.[4]

77.     The Banyan Entities spent the next several months working to meet the Senior Lender's milestones and raise the necessary funds to access the recapitalized deal. Specifically, the Banyan Entities management and members created a new Class B membership interest in Banyan Cay Investment, which Class B membership benefits from preferred liquidation and distribution rights, ultimately raising approximately $10 million in the preferred equity over the course of 2020 and 2021.

**VI.     Proposed Out of Court Transaction and Chapter 11 Cases**

78.     Unfortunately, the various milestones ultimately became too much and in and around April 2022, the Banyan Entities acknowledged that a sale of its assets was in the best interest of all creditors.

---

[4] As just one example, on December 31, 2020, counsel to the Mezzanine Borrower emailed counsel to the Mezzanine Lender attaching prior pipeline reports and stating "we do not understand why similar reports cannot be provided for the new investors."  Counsel to the Mezzanine Lender ignored this email.

79.     To that end, the Banyan Entities engaged Hodges Ward Elliott, a well-known broker in the hospitality arena, to run a competitive and expedited sale process, which was placed on a fast-track, which contemplated receiving final bids by July of 2022, diligence completed in August and final closing in September.

80.     On September 16, 2022, the Banyan Entities entered into a purchase and sale agreement (the "**PSA**") with 2020 Banyan LLC (the "**Original Purchaser**") to sell almost all of their respective real property.

81.     Despite the progress of the out-of-court sale process, on December 16, 2022, the Finkelstein Parties sent formal notices of default and began efforts to schedule a strict foreclosure sale of the equity pledged by Banyan Cay Mezzanine Borrower on account of the EB-5 loan, and in the process incurred in excess of $250,000 in extraneous marketing fees, despite understanding that any such UCC sale would be stayed by a bankruptcy proceeding.

82.     The Finkelstein Parties ultimately scheduled a UCC public auction sale of the pledged equity for February 17, 2023.

83.     Although the agreement with the Original Purchaser was renegotiated to reduce the purchase price, in mid-January 2023 the proceeds of the proposed sale to Purchaser pursuant to the Proposed Out of Court Transaction would have been sufficient to pay the Senior Lender's claims in full, pay all unsecured creditors of the Banyan Entities in full (creditors that are structurally senior to the Mezzanine Lender) and provide a substantial initial recovery to the Mezzanine Lender.

84.     The Mezzanine Lender, through counsel, repeatedly encouraged counsel to the Banyan Entities to close the Proposed Out of Court Transaction.

85.     In an effort to finalize the Proposed Out of Court Transaction, on February 13, 2023 the Original Purchaser, an affiliate of the Original Purchaser and the Banyan Entities entered into a second amended to the PSA (the "**Second Amendment**") providing for a total purchase price for the Project of $113 million.

86.     The next day on February 14, 2023, counsel to the Mezzanine Lender was provided with the Second Amendment and informed that a waterfall showing distribution of the sale proceeds from the Proposed Out of Court Transaction would be forthcoming.

87.     That waterfall was provided on February 15, 2023 and showed an initial payment to Mezzanine Lender of $4.25 million as an initial payment at closing pending reconciliation of other costs and fees that were required by law to be paid ahead of the Mezzanine Lender.

88.     But, after receiving the waterfall, counsel to the Mezzanine Lender reversed course and informed counsel to the Banyan Entities that the proposed waterfall was unacceptable and the Mezzanine Lender would refuse to adjourn the February 17, 2023 UCC public auction, despite the known value destructive impact of same.

89.     Upon information and belief, Finkelstein opposed the out of court sale transaction that provided an immediate substantial recovery to the Mezzanine Lender's EB-5 Investors and the possibility of their eventual payment in full because the sale proceeds available at closing would not cover over $1 million in fees and interest that adhered primarily for Finkelstein's personal benefit.

90.     Faced with no other options to preserve estate value, on February 16, 2023, to stave off the UCC sale and preserve the Project's value, Mezzanine Borrower filed its Bankruptcy Case, which ultimately caused the Proposed Out of Court Transaction to unravel, destroying value and

introducing uncertainty for all parties in interest, including Mezzanine Lender and the EB-5 Investors.

91.     The other Banyan Entities filed their respective Bankruptcy Cases of March 29, 2023. On May 1, 2023, the bankruptcy court approved procedures for the sale of the Banyan Entities' assets and approved a stalking horse bidder for same.

92.     On the same date that Mezzanine Lender commenced its Bankruptcy Case, Finkelstein caused the Mezzanine Lender to file a complaint commencing the Standstill Agreement Action against the Senior Lender on February 16, 2023 alleging breaches of the Standstill Agreements.

93.     The Standstill Agreement Action was stayed on May 2, 2023 by stipulation and order signed and filed by Mezzanine Lender and Senior Lender April 26 (and ordered by the court on May 2), in which Mezzanine Lender agreed that, due to the pending sale "it would result in the most efficient  use of party and judicial resources" to delay Senior Lender's response deadline "until 30 days after the Bankruptcy Sales take[] place, until August 14, 2023.  Standstill Agreement Action [D.I. 13].

## FIRST COUNTERCLAIM AGAINST PLAINTIFF AND FIRST THIRD-PARTY CLAIM AGAINST AMERICAN IMMIGRATION FOR INDEMNIFICATION

94.     The foregoing paragraphs 1-93 are incorporated herein in their entirety as if set forth in full.

95.     Finkelstein caused both Mezzanine Lender and American Immigration in the First American Immigration Term Sheet, the Second American Immigration Term Sheet and the Third American Immigration Term Sheet (collectively, the "**Term Sheets**") to obligate themselves to indemnify all "Developer Indemnified Parties," which includes Defendant.

96.     The Term Sheets include identical indemnification obligations on the part of Mezzanine Lender and American Immigration and obligate Mezzanine Lender and American Immigration to "jointly and severally, indemnify and hold harmless Defendant" for:

all actual losses, claims, damages and liabilities (including all legal or other expenses reasonably incurred by [Defendant] caused by or arising out of (i) any material misrepresentation or omission made by [American Immigration] and/or Lender or any of their respective agents, or (ii) the bad faith, gross negligence or willful misconduct of [American Immigration] and/or Lender or any of their respective agents, or (iii) any breach by [American Immigration] or Lender or any of their respective agents of any U.S. or foreign law in performing the services or other undertakings set forth in this Term Sheet, including all exhibits hereto irrespective of Section B being reduced to the Definitive Agreements.

97.     Finkelstein and American Immigration received significant benefits in exchange for these indemnification obligations, including up-front fees paid upon execution of each of the Term Sheets that were non-refundable even if American Immigration, Finkelstein and the Mezzanine Lender failed to provide any EB-5 financing, and the reimbursement of numerous lavish trips and expenses over a five year period purportedly to raise EB-5 financing.

98.     As described above, since entry into the First American Immigration Term Sheet in 2015, the Second American Immigration Term in 2016 and the Third American Immigration Term Sheet in 2018, Finkelstein and American Immigration made numerous material misstatements and omissions, acted in bad faith  and with willful misconduct, and breached the Term Sheets numerous times, requiring American Immigration and Mezzanine Lender to indemnify Defendant for all losses caused by or arising out of such misconduct by American

Immigration, Mezzanine Lender and Finkelstein, including, without limitation, (a) numerous material misrepresentations regarding Finkelstein's and American Immigration's experience and ability to raise EB-5 financing for the Project, (b) numerous material misrepresentations regarding the status of EB-5 financing for the Project, and (c) consistently failing to provide the contractually required reporting information regarding the progress of the Finkelstein Parties in obtaining EB-5 financing.

99.    As described above, Defendant suffered significant harm due to Finkelstein's, American Immigration's and Mezzanine Lender's misconduct, including, without limitation, (a) investing at least $[25] million of his own funds between 2018 to 2020 when Finkelstein and American Immigration failed to deliver the EB-5 financing they promised, (b) diluting his equity ownership in the project by millions, (c) engaging in a "fire sale" of part of the Project to raise capital that Finkelstein and American Immigration repeatedly promised Defendant would be available through EB-5 financing they would raise, (d) causing Hotel Borrowers to agree to milestones in the Senior Loan Agreement, (e) agreeing to milestones in the Senior Loan Agreement and the A&R Senior Loan Agreement that could not be met without Finkelstein and American Immigration delivering EB-5 financing, (f) all losses suffered by Defendant arising from entry into the Senior Loan Guarantees, (g) all losses suffered by Defendant arising from entry into the Mezzanine Loan Guarantees (collectively, the "**Defendant's Losses**").

100.    The consistent misrepresentations and omissions from Finkelstein, American Immigration and the Mezzanine Lender since the inception of the relationship prevented Defendant from discovering that the Finkelstein Parties' misconduct caused the Defendants' Losses.

WHEREFORE, Defendant respectfully requests that the Court enter judgment in favor of Defendant and against Mezzanine Lender and American Immigration and enforce the indemnification obligations Mezzanine Lender and American Immigration contractually agreed and award Defendant damages in an amount to be determined at trial and not less than all of Defendant's Losses.

### SECOND COUNTERCLAIM AGAINST PLAINTIFF AND SECOND THIRD-PARTY CLAIM AGAINST FINKELSTEIN AND AMERICAN IMMIGRATION FOR FRAUD

101.    The foregoing paragraphs 1-93 are incorporated herein in their entirety as if set forth in full.

102.    Each of the Term Sheets were arm's length transactions where, in exchange for significant fees and the right to be the exclusive provider of EB-5 financing for the Project, the Finkelstein Parties undertook specific contractual obligation to provide "weekly reports "detailing progress in fundraising efforts and listing subscription agreements executed by Foreign Investors and the status of immigration applications submitted by such Foreign Investors." (the "**Weekly Pipeline Reports**"). Term Sheets § C 3.

103.    The contractual obligation to provide the Weekly Pipeline Reports gave rise to a duty to disclose all material information relating to the progress of EB-5 financing.

104.    From entry into the First American Immigration Term Sheet in 2015 through and including at least 2021, the Finkelstein Parties never complied with their obligation to provide the Weekly Pipeline Reports, and refused numerous oral and written requests directly and through counsel for compliance.  Instead, the Finkelstein Parties provided sporadic, incomplete and misleading information to induce the Banyan Entities to continue paying their fees and expenses.

105.    The Finkelstein Parties repeated material misrepresentations and omissions were made knowingly and intentionally to extract fees from Defendant and entrench the Finkelstein Parties as the exclusive EB-5 financing provider for the Project.

106.    The Finkelstein's Parties consistent misrepresentations and omissions since the inception of the relationship prevented Defendant from discovering that the Finkelstein Parties' misconduct.

107.    Defendant relied on the Finkelstein Parties material misrepresentations and omissions.

108.    The Finkelstein Parties' material misrepresentations and omissions caused Defendant harm in an amount to be determined at trial, including but not limited to the Defendants' Losses.

WHEREFORE, Defendant respectfully requests that the Court enter judgment in favor of Defendant and against Finkelstein, American Immigration and the Mezzanine Lender for fraud and fraud by omission in an amount to be determined at trial but not less than the Defendant's Losses.

### THIRD COUNTERCLAIM AGAINST PLAINTIFF AND THIRD THIRD-PARTY CLAIM AGAINST FINKELSTEIN AND AMERICAN IMMIGRATION FOR FRAUD BASED ON BREACH OF DUTY TO DISCLOSE

109.    The foregoing paragraphs 1-93 are incorporated herein in their entirety as if set forth in full.

110.    Each of the Term Sheets were arm's length transactions where, in exchange for significant fees and the right to be the exclusive provider of EB-5 financing for the Project, the Finkelstein Parties undertook specific contractual obligation to provide "weekly reports "detailing progress in fundraising efforts and listing subscription agreements executed by Foreign Investors

and the status of immigration applications submitted by such Foreign Investors." (the "**Weekly Pipeline Reports**").  Term Sheets § C 3.

111.    The contractual obligation to provide the Weekly Pipeline Reports gave rise to a duty to disclose all material information relating to the progress of EB-5 financing.

112.    From entry into the First American Immigration Term Sheet in 2015 through and including at least 2021, the Finkelstein Parties refused numerous oral and written requests directly and through counsel for compliance with their requirements; instead providing only sporadic, incomplete and misleading information to induce the Banyan Entities to continue paying their fees and expenses.

113.    The Finkelstein Parties repeated material misrepresentations and omissions were made knowingly and intentionally to extract fees from Defendant and entrench the Finkelstein Parties as the exclusive EB-5 financing provider for the Project.

114.    Defendant relied on the Finkelstein Parties material misrepresentations and omissions.

115.    The Finkelstein Parties' material misrepresentations and omissions caused Defendant harm in an amount to be determined at trial, including but not limited to the Defendants' Losses.

116.    The Finkelstein Parties' material misrepresentations and omissions caused Defendant harm in an amount to be determined at trial, including but not limited to the Defendants' Losses.

WHEREFORE, Defendant respectfully requests that the Court enter judgment in favor of Defendant and against Finkelstein, American Immigration and the Mezzanine Lender for fraud by omission in an amount to be determined at trial but not less than the Defendant's Losses.

**FOURTH THIRD-PARTY CLAIM AGAINST PLAINTIFF AND FOURTH THIRD-PARTY CLAIM AGAINST FINKELSTEIN AND AMERICAN IMMIGRATION FOR FRAUDULENT INDUCEMENT TO ENTER INTO MEZZANINE LOAN GUARANTEES**

117.    The foregoing paragraphs 1-93 are incorporated herein in their entirety as if set forth in full.

118.    Finkelstein, American Immigration and the Mezzanine Lender knowingly and intentionally made fraudulent and false material statements of fact relating to EB-5 financing including, without limitation, their ability to obtain EB-5 financing.

119.    Finkelstein, American Immigration and the Mezzanine Lender knew or should have known of the falsity of the statements.

120.    Finkelstein, American Immigration and the Mezzanine Lender also omitted material facts from Defendant - all of which they knew or should have known negatively impacted the ability to raise EB-5 funding. Upon information and belief, the Undisclosed Finkelstein/Allied Capital Litigation had irreparably damaged Finkelstein's credibility and standing within the EB-5 community, his relationships with other EB-5 related professionals who direct EB-5 Investors to particular projects and his ability to actually raise EB-5 funding.

121.    Finkelstein, American Immigration and the Mezzanine Lender intended that the false statements and omissions induce Defendant's reliance.

122.    Defendant justifiably relied on such false representations and omissions to Defendant's detriment and by entering into the Mezzanine Loan Guarantees.

WHEREFORE, Defendant respectfully requests that the Court enter judgment in favor of Defendant and against Finkelstein, American Immigration and the Mezzanine Lender for fraudulently inducing Defendant to enter into the Mezzanine Loan Guarantees and order recission

of the Mezzanine Loan Guarantees, or, in the alternative, damages in an amount to be determined at trial but not less than the Defendants' Losses relating to the Mezzanine Loan Guarantees.

### FIFTH THIRD-PARTY CLAIM AGAINST PLAINTIFF AND FIFTH THIRD-PARTY CLAIM AGAINST FINKELSTEIN AND AMERICAN IMMIGRATION FOR NEGLIGENT MISREPRESENTATION

123.     The foregoing paragraphs 1-93 are incorporated herein in their entirety as if set forth in full.

124.     Finkelstein, American Immigration and the Mezzanine Lender made false material statements of fact relating to EB-5 financing including, without limitation, their ability to obtain EB-5 financing, that they believed to be true, but were false.

125.     Finkelstein, American Immigration and the Mezzanine Lender should have known of the falsity of the statements.

126.     Finkelstein, American Immigration and the Mezzanine Lender also omitted material facts from Defendant - all of which they should have known negatively impacted the ability to raise EB-5 funding. Upon information and belief, the Undisclosed Finkelstein/Allied Capital Litigation had irreparably damaged Finkelstein's credibility and standing within the EB-5 community, his relationships with other EB-5 related professionals who direct EB-5 Investors to particular projects and his ability to actually raise EB-5 funding.

127.     Finkelstein, American Immigration and the Mezzanine Lender intended that the false statements and omissions induce Defendant's reliance.

128.     Defendant justifiably relied on such false representations and omissions to Defendant's detriment and by entering into the Mezzanine Loan Guarantees.

WHEREFORE, Defendant respectfully requests that the Court enter judgment in favor of Defendant and against Finkelstein, American Immigration and Mezzanine Lender for damages in

an amount to be determined at trial but not less than the Defendants' Losses relating to the Mezzanine Loan Guarantees.

Dated:  June 13, 2023                           Respectfully Submitted,

JONES FOSTER P.A.
Attorneys for Defendant
505 S. Flagler Drive, Suite 1100
West Palm Beach, FL 33401
(561) 659-3000 [Telephone]
(561) 650-5300 [Facsimile]

By: /s/ Stanley Dale Klett, Jr.
Stanley Dale Klett, Jr.
Florida Bar No:  435716
sklett@jonesfoster.com
Robert W. Wilkins
Florida Bar No:  578721
rwilkins@jonesfoster.com
Michael J. Gore
Florida Bar No: 071886
mgore@jonesfoster.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

By: /s/ Stanley Dale Klett, Jr.
Stanley Dale Klett, Jr.
Florida Bar No: 435716

50

**BANYAN CAY v GATTO**
**CASE NO:  9:23-cv-80707-DMM**
**SERVICE LIST**

Isaac Marcushamer
Daniel Y. Gielchinsky
DGIM LAW, PLLC
2875 NE 191st Street, Suite 705
Aventura, FL  33180
(305) 763-8708 [Telephone]
isaac@dgimlaw.com
dan@dgimlaw.com
*Attorneys for Plaintiff*

Robert W. Wilkins
Stanley Dale Klett, Jr.
Michael J. Gore
JONES FOSTER P.A.
505 S. Flagler Drive, Suite 1100
West Palm Beach, FL 33401
(561) 659-3000 [Telephone]
(561) 650-5300 [Facsimile]
rwilkins@jonesfoster.com
sklett@jonesfoster.com
mgore@jonesfoster.com
*Attorneys for Defendant*